**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

---

**No. 04-12**

---

ELIAS HANNA SYRIANI,

Petitioner - Appellant,

versus

MARVIN POLK, Warden, Central Prison, Raleigh,
North Carolina,

Respondent - Appellee.

---

Appeal from the United States District Court for the Western
District of North Carolina, at Charlotte. Graham C. Mullen, Chief
District Judge. (CA-00-208-3-MU)

---

Argued: September 28, 2004          Decided: December 21, 2004

---

Before NIEMEYER, TRAXLER, and SHEDD, Circuit Judges.

---

Affirmed by unpublished opinion. Judge Traxler wrote the opinion,
in which Judge Niemeyer and Judge Shedd joined.

---

**ARGUED:** Henderson Hill, FERGUSON, STEIN, CHAMBERS, ADKINS, GRESHAM
& SUMTER, Charlotte, North Carolina, for Appellant. Edwin William
Welch, NORTH CAROLINA DEPARTMENT OF JUSTICE, Raleigh, North
Carolina, for Appellee. **ON BRIEF:** Jacob H. Sussman, FERGUSON,
STEIN, CHAMBERS, ADKINS, GRESHAM & SUMTER, Charlotte, North
Carolina, for Appellant. Roy Cooper, North Carolina Attorney
General, NORTH CAROLINA DEPARTMENT OF JUSTICE, Raleigh, North
Carolina, for Appellee.

---

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

TRAXLER, Circuit Judge:

Elias Hanna Syriani was convicted by a North Carolina jury of the capital murder of his wife and sentenced to death. After unsuccessfully challenging his convictions in state court on direct review and in state habeas proceedings, Syriani filed a petition for writ of habeas corpus in federal district court. See 28 U.S.C.A. § 2254 (West 1994 & Supp. 2004). The district court denied his application for relief, but granted his certificate of appealability. For the reasons set forth below, we affirm.

I.

Elias Syriani was convicted of stabbing to death with a screwdriver his estranged wife, Teresa Yousef Syriani. Shortly before the attack, Teresa had obtained a protective order from a North Carolina court requiring Syriani to move out of the marital home and to stay away from her and their four children. Syriani moved to a nearby hotel.

The facts underlying Teresa's death are fully set forth in the North Carolina Supreme Court's opinion on Syriani's direct appeal. See State v. Syriani, 428 S.E.2d 118 (N.C. 1993). The court summarized the evidence of the attack as follows:

> On 28 July 1990, around 11:20 p.m., defendant drove to their home, but his wife had not returned from work. As she drove her automobile onto a nearby street, defendant blocked her way with his van. Defendant got out of his van, gestured, and chased after her

3

> car as she put it in reverse. As his wife sat
> in her car, defendant began stabbing her with
> a screwdriver through the open door or window,
> while their ten-year-old son John sat in the
> seat beside her. John was unable to stop his
> father; he got out of the car and ran home to
> get his older sister [Rose].

Id. at 121. John told Rose that Syriani was killing their mother. He then ran to a friend's house, and the two boys returned to Teresa's car. When they arrived, however, they found Syriani still there, kneeling at the open door and stabbing Teresa. At some point, Syriani stopped his attack, walked back to the van, and yelled in Arabic, "Go home, bastard," to John. J.A. 367. Rose ran to her mother, who was still conscious at the time. She arrived in time to see her father get into the van, look directly at her, and drive away.

Two neighbors witnessed the attack. Boyd Wilson testified that the sound of children yelling outside prompted him to look out the window of his home. He saw a van across the street with the door open and the interior lights on. He returned to his den and sat down, but heard more noises and yelling, prompting him to again look out the window. This time, he saw Syriani walking across the street towards the van. Syriani got into the van, fumbled with something, and then walked back across the street to a car parked in the driveway next to Wilson's house. Syriani leaned inside the car and the car began to shake. When Wilson went outside to see what was wrong, he observed Syriani yelling something at John and

4

his friend.  Syriani then got into the van and drove away.  Wilson heard a young woman yelling, "[s]omebody help my mother," and ran to the car.  J.A. 250.  He found Teresa covered in blood.  According to Wilson, Teresa looked "like somebody [who] had been shot in the face with a load of buckshot."  J.A. 252.

Another neighbor, Thomas O'Connor, testified that he looked out the window of his home and saw a man stabbing into a car with what appeared to be a screwdriver.  O'Connor ran outside and yelled at the man.  The man turned and made eye contact, but continued to stab into the car.  O'Connor ran inside to call the police, but arrived back outside in time to see a van pulling away from the neighborhood.  According to O'Connor, the man stopped the van, got out of the vehicle, and started walking back towards the car.  When he saw O'Connor, however, he returned to the van and drove away.

Immediately after stabbing his wife, Syriani fled to a nearby fire station and sought medical treatment for scratches on his face, arms, and chest.  He told the firemen that his wife had assaulted him.  He was arrested by the police at the fire station shortly thereafter and taken, at his request, to the emergency room.  The emergency room physician testified that Syriani had a bruise on his hand, an abrasion on his lower leg, and minor scratches on his nose and shoulder.  He testified that Syriani told him that he had been assaulted by his wife.  Syriani was charged with assault with a deadly weapon with intent to kill.  Twenty-

eight days after the attack, Teresa died as a result of a wound that penetrated three inches into her brain. Syriani was then charged with capital murder.

At trial, Syriani and his sister Odeet testified about Syriani's cultural and social background and his arranged marriage to Teresa. Odeet and Syriani were both born in Jerusalem, in Palestine at the time. Syriani's family, however, was Catholic, a minority in the Arab community. They lived in a one-room house in Jerusalem, and their father was a laborer. His mother did not work outside the home. According to Syriani, his father developed cancer when Syriani was twelve years old and could no longer work. Because he was the oldest boy, Syriani had to quit school (he was in the sixth grade at the time) and work to help his mother raise the other five children. He testified that the family, including his father and mother, all moved to Amman, Jordan, and rented a home there. He testified that his father lived another three or four years after he developed cancer, but was never able to return to work. According to Syriani, he first trained as a machinist making very low wages. When he was 19 years old, Syriani began working as a civilian machinist in the Jordanian Army, but testified his wages were still low. He worked for the Army for approximately nine years. He testified that his mother went to work as a housekeeper to help, but that his sisters did not work because, in his culture, women did not work outside the home. As

6

explained by Syriani, "we don't have a job for a woman. A woman, they take care of a family." J.A. 766. Women "go to school to finish school, and then they engage and then they get married." J.A. 766. However, Syriani testified that his sisters could not attend school because their family could not afford to buy the books and other things necessary from them to attend the Jordanian schools. After Syriani left his job with the Army, he began working as a machinist for a company in Jordan and, in addition, began working in a radio station singing Arabic.

Syriani testified that in the mid-1970s, his mother quit working and he was primarily taking care of the family's needs. At this point, Syriani testified that he felt financially able to marry. He explained the traditions and customs of an Arabic marriage. According to Syriani, when a man decides to get married, his family begins to look for a woman within their culture and religion. When the family finds an appropriate woman, there is an engagement to allow the couple to get to know each other. "[A]fter that, if they like each other, they get married. And after they get married, they have kids. And most of the people, they live without divorce." J.A. 771. According to Syriani, there was very little divorce in Jordan, "maybe five percent, something like that." J.A. 771. Most families, he testified, "live forever with the kids, with the family." J.A. 771.

7

Syriani and Odeet testified that Syriani met and married Teresa, who had previously immigrated to the United States and was living in New Jersey, through George Asmarish, a friend of Syriani's who had immigrated to the United States in 1969. Asmarish wrote to Syriani and told him that he had met a family with "a nice girl if [Syriani] would like to get married." J.A. 773. Syriani and Teresa exchanged pictures and wrote to one another for about three months. Teresa then traveled to Jordan for the wedding. After two or three weeks, Teresa returned to the United States. Syriani joined her two months later.[1]

Syriani testified that after he joined Teresa in the United States, he stayed in her father's house for about three days. He and Teresa then moved to Washington, D.C., where he had friends, to work. After about three months, the couple moved to the Chicago area where Syriani could work as a machinist. Although Teresa worked briefly outside the home during the early months of their marriage, she quit working after their first child, Rose, was born. Their children (Rose, Sara, John, and Janet) were all born while they were living in Chicago. The family spoke primarily Arabic in the home.

In 1986, Syriani moved his family to Charlotte, North Carolina, to begin a new job. In Illinois, Teresa had not worked

---

[1] The State called as a witness Teresa's sister, Alice Safar. She also testified about the arranged marriage of her sister to Syriani.

8

outside the home since the birth of their first child and had dressed according to Arabic tradition, which included wearing no makeup. After the move, however, Teresa expressed a desire to work outside the home. When she took a job working evenings at a nearby gas station, Syriani disapproved. She learned to drive and met new friends, and she began to wear makeup and dress in a more American fashion. According to Syriani, they began to argue. "She change[d] [alot]. After three, four months, my wife [was] someone else. I try to get better with her, but she -- at that time I wasn't happy from her change because she changed fast, very fast." J.A. 791. Marital problems escalated, problems that, according to Syriani, had not existed before the move to Charlotte.

Although Syriani admitted striking his wife three or four times during the first five years of their marriage, he denied physically abusing her after that time. According to Syriani, the reverse was true. He testified that Teresa hit him almost every day in front of the children and that she called the police several times even though he was not doing anything to her. According to Syriani, the "last three months she used to beat [him]," J.A. 835, but he "didn't touch her," J.A. 836. He testified that his daughters laughed at him when Teresa hit him. He also denied ever physically abusing the children and testified that he had only spanked them on rare occasions for their misbehavior.

9

The children offered a much different view of the marriage. According to them, domestic violence had always been characteristic of the marriage, although it escalated after the move to Charlotte. John and Rose testified that their parents argued frequently, and they described several specific instances of domestic violence between their parents during these years.[2] One such incident, which occurred in the summer of 1988, culminated in the police taking Teresa and the children to a battered women's shelter, which was followed by a short stay with Teresa's sister in New Jersey. John and Rose testified that in 1990, their parents began to argue more and more. Syriani did not like Teresa's departure from the traditional Arabic customs and beliefs; he wanted her to quit working outside the home and stay at home with the children and be a housewife again.

In June 1990, Teresa told Syriani that she intended to divorce him. Syriani, in accordance with Arabic traditions, wrote to

---

[2]    For example, John testified that his parents argued several times a week. He saw his father slap his mother and backhand her across the ear on one occasion, and overheard his father call his mother a whore when they argued. Rose testified that her parents fought constantly. Moreover, her father had threatened them with a bat, chased her mother with the bat, screamed and cursed at them, and called her and her mother whores. She testified that her mother would try to defend herself, but when she thought Syriani would hit her, she would run upstairs and join the children. Rose testified that her father frequently became angry and would break furniture to scare them. She also testified that her father beat her and, on one occasion, grabbed her around her throat with his hand and told her he was going to kill her. On another occasion, he grabbed her by the hair and kicked her repeatedly for scratching his van.

Teresa's brothers in Jerusalem and Minnesota for help, but to no avail. There was evidence that Syriani threatened to kill Teresa if she ever left him. Nevertheless, Teresa took the children and temporarily moved into a motel. She then obtained a court order requiring Syriani to leave the marital home and to stay away from her and the children. According to Syriani, Teresa appeared at their home with two policemen and the order and told him that he had to relinquish his house keys and leave. Syriani testified that he took his clothes and began living in motels. Teresa rebuffed Syriani's attempts at reconciliation and rejected his request that they seek marital counseling.

According to Syriani, in the late evening hours of July 28, 1990, he was watching the road that Teresa and John would travel home from her job at the gas station, and he became worried because Teresa's car had not yet passed. Thinking that he had missed her, he drove to the neighborhood, but he did not see her car. As he was driving out, he saw Teresa's car pull into the neighborhood. He testified that he stopped his van to talk to her, but he denied blocking her path of travel. According to Syriani, Teresa stopped her car as well and he approached the driver's side window, which was down. Syriani testified that he was worried and hurt. He testified that he asked Teresa, "With whom did you leave my kids, by themselves?" J.A. 815. According to Syriani, Teresa did not like what he said and scratched his face. He pushed her away from

his face, but Teresa opened the car door and hit him with enough force to cause an injury to his leg. According to Syriani, he grabbed the door, but by that time she had put the car in reverse. He testified that he had a "screwdriver in [his] pocket, and [he] hit her from the window." J.A. 817. Syriani testified that he was moving with the door, with the car moving in reverse. He testified that he did not intend to hurt her or kill her, and only remembers hitting her three or four times.

In addition to presenting the testimony of Syriani regarding the events of that night, Syriani's counsel called a number of neighbors and co-workers who testified that Syriani was a gentle, hard-working man, with a good nature and character, and that the Syriani household was a loving and happy one.

In closing argument, trial counsel urged the jury to find that Syriani and Teresa, embroiled in an emotional divorce situation, had become engaged in an argument, and that Syriani had responded reasonably and in self-defense to his being scratched, hit by the door, and carried backwards down the street by the moving car. He argued that there was no evidence of premeditation and deliberation on Syriani's part, which was necessary to convict Syriani of first degree murder, and that there was also no malice, which was necessary to convict Syriani of second degree murder. At most, counsel argued, the jury should consider Syriani's actions as voluntary manslaughter because he had responded to Teresa's attack

12

and inflicted the fatal wound, without malice, but in the heat of passion. The jury found Syriani guilty of first-degree murder on the basis of premeditation and deliberation.

During the penalty phase of the trial, counsel again presented Syriani as a hardworking immigrant who lost control of his emotions on the night that he stabbed his wife. Counsel primarily relied upon the testimony of the neighbors and acquaintances who had testified during the guilt phase as to Syriani's good character and work ethic. Counsel also presented evidence that Syriani, while released on bond, did not attempt to flee the country and, instead, took steps to ensure that his children were cared for and given a home with his mother and sister Odeet, who had by that time also immigrated to the United States and settled in the Chicago area. Counsel also presented the testimony of a Mecklenburg County jailor that Syriani had adjusted well to incarceration and had been a model prisoner. Syriani testified during the penalty phase as well. He testified that he loved his wife and that, at the time of the assault, he was very emotional and upset; he felt as if he were losing his wife and children and had lost control of his family. He testified that he was deeply sorry for what he had done.

In rebuttal, the State presented the testimony of Sara Syriani, the couple's middle daughter. Sara testified that she witnessed her father chase her mother with a pair of scissors during one argument, backhand her mother in the ear while they were

13

riding in the car on another occasion, and pull her mother down the stairs by her hair and rip her shirt on yet another occasion. She also testified that Syriani had pushed her down and kicked her while she was looking for a shoe that she had lost.

At the conclusion of the penalty phase, the jury found as an aggravating factor that the murder of Teresa was especially heinous, atrocious, or cruel. The jury also found eight mitigating circumstances, but unanimously decided that the aggravating circumstance outweighed these mitigating circumstances and recommended that Syriani be sentenced to death. On direct appeal, the North Carolina Supreme Court affirmed Syriani's conviction and death sentence, see Syriani, 428 S.E.2d at 121, and the United States Supreme Court denied Syriani's petition for writ of certiorari, see Syriani v. North Carolina, 510 U.S. 948 (1993).

After his conviction, new counsel was appointed to represent Syriani in his efforts to obtain post-conviction relief. Syriani filed his motion for appropriate relief ("MAR") in the North Carolina Superior Court alleging, inter alia, that his trial counsel had provided constitutionally deficient legal assistance during the penalty phase of his trial by failing to investigate and present mitigating evidence of Syriani's cultural and social background in Palestine and Jordan and by failing to investigate and present mitigating evidence of mental illness. The state court granted Syriani's request for funds to hire an investigator and a

14

translator and granted Syriani's request for an independent psychological and psychiatric examination.

At the conclusion of an evidentiary hearing, the state MAR court ruled that Syriani failed to prove that his counsel's representation during the penalty phase was deficient and, in any event, that Syriani had received "a fair trial that produced reliable results." J.A. 2425. Consequently, the state court denied Syriani relief, and the North Carolina Supreme Court denied review. See State v. Syriani, 536 S.E.2d 319 (N.C. 1999).

Syriani then filed a petition for a writ of habeas corpus in the district court pursuant to 28 U.S.C.A. § 2254, again alleging ineffective assistance of counsel. The district court denied the petition, but granted Syriani's application for a certificate of appealability, see 28 U.S.C.A. § 2253 (West Supp. 2004), as to Syriani's claim that he received ineffective assistance of counsel during the penalty phase of the trial. This appeal followed.[3]

II.

The Sixth Amendment requires that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence," U.S. Const. amend. VI, and that such assistance be effective, see Strickland v. Washington,

___

[3] We subsequently denied Syriani's motion to expand the certificate of appealability to include a claim that the state MAR proceedings deprived Syriani of a full and fair opportunity to develop his ineffective assistance of counsel claim.

466 U.S. 668, 686 (1984). In order to establish an ineffective assistance of counsel claim, Syriani was required to establish (1) that his "counsel's representation fell below an objective standard of reasonableness," measured by the "prevailing professional norms," id. at 688, and (2) "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," id. at 694. "Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable." Id. at 687.

Because Syriani's Sixth Amendment claim was adjudicated on the merits by the North Carolina state court, Syriani's claims are subject to the deferential standards set forth in the amendments to 28 U.S.C.A. § 2254(d), enacted as part of the Antiterrorism and Effective Death Penalty Act of 1996. A federal habeas court is precluded from granting habeas relief unless it concludes that the state court's adjudication of a claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C.A. § 2254(d); see also Williams v. Taylor, 529 U.S. 362, 412 (2000).

16

However, Syriani argues that the state MAR court, when evaluating the second prong of Strickland's test, i.e., the "prejudice" prong, misread the Supreme Court's decision in Lockhart v. Fretwell, 506 U.S. 364 (1993), as requiring a determination that there is a reasonable probability that, absent counsel's errors, the result of the proceeding would have been different and, if so, that the defendant did not receive "a fair trial that produced reliable results." J.A. 2425. We agree.

The Supreme Court has "dismissed the idea that we must separately inquire into fundamental fairness even if a petitioner is able to show that his lawyer was ineffective and that the ineffectiveness probably affected the outcome of the proceeding." Tucker v. Catoe, 221 F.3d 600, 608 (4th Cir. 2000) (citing Williams, 529 U.S. at 391-93). Because the North Carolina court interjected an additional "fundamental fairness" inquiry into the prejudice prong of Strickland, its determination that any deficient performance on the part of Syriani's counsel was not prejudicial was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C.A. § 2254(d). Accordingly, we review the state court's adjudication of the deficient performance test to determine whether it is an unreasonable application of the principles set forth by the Supreme Court, but we review the state court's application of the prejudice prong to Syriani's

17

ineffectiveness claim de novo, unconstrained by the deference mandated by the AEDPA.

## III.

Syriani claims that trial counsel unreasonably failed to present mitigating evidence related to his cultural background and mental health and that, had Syriani's jury been provided with this additional evidence, "there is a reasonable probability that at least one juror would have struck a different balance." See Wiggins v. Smith, 539 U.S. 510, 537 (2003). For the reasons that follow, we disagree.

## A.

We begin with Syriani's claim that trial counsel unreasonably failed to investigate and present mitigating evidence of his cultural background and social history. Syriani asserts that, had counsel conducted a thorough investigation into the first thirty-seven years of his life in Palestine and Jordan, they would have uncovered a number of family members, friends, and co-workers in Jordan who were willing to testify about his difficult life before he immigrated to the United States.

Syriani did not testify at the state MAR hearing about his background. Rather, through summaries of interviews conducted by others of these family members and acquaintances, and through interviews that Syriani had with the "cultural expert" retained on his behalf for the MAR proceeding, Syriani presented a number of

18

additional facts about his life in Palestine and Jordan. According to this additional evidence, Syriani's home in Palestine was annexed to the Israeli state when Syriani was twelve years old. Although Syriani did not directly live in a war zone, the Israelis rounded up all the men in his village, including his father, and took them to concentration camps. A year or two later, his father was released to return home and the family moved to Jordan where one of his sisters already lived. Syriani claims that his father was unable to work and that his father was laughed at by others in the community. No one respected his father in Jordan, not even his mother, who was cruel and indifferent to him. According to Syriani, "She used to hit him with her shoe just like my wife [Teresa] used to raise her hand against me in the last year of our marriage." J.A. 2300. The family was socially isolated as a result. Syriani also suspected that his mother had extramarital affairs during these years, which "shamed him deeply." J.A. 2301. Syriani and his family lived in extreme poverty and his mother abused him physically and emotionally. According to Syriani, he wet the bed until he was fifteen years old, and his mother humiliated him for this problem.

In addition to the claim that counsel was ineffective for failing to uncover and present this additional personal history, Syriani asserts that trial counsel was ineffective for failing to retain a "cultural expert" to provide the jury with testimony about

19

the fundamental differences between Arabic and Western culture, Syriani's difficulties with his cultural assimilation into this country, and how this difficulty affected his behavior on the night of the attack. As a result of these failures, Syriani asserts that the jury was "unable to understand the influence of culture on [his] ideas, thinking process, ideals and methods of communication." J.A. 1161. An expert in Arabic culture and history, Syriani claims, would have been able to explain and place in context this clash of American and Arab culture.

Post-conviction counsel took this step, retaining Dr. Akram Khater, Ph.D., a history professor from North Carolina State University who specializes in Arabic history and culture, to evaluate Syriani. Dr. Akram conducted interviews with Syriani and developed a social and family history, and presented this evidence to the state MAR court by affidavit. In particular, Dr. Akram provided more detailed information about the norms and traditions in the Arab culture and, in particular, the expectations and accepted behaviors of men and women in a traditional Arabic marriage, which Syriani strove to maintain with Teresa.

In death penalty cases, defense attorneys are required to undertake a reasonable investigation into possible mitigating evidence that can be presented during the penalty phase. See Wiggins, 539 U.S. at 521-23. "[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that

20

makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." Strickland, 466 U.S. at 691. "[T]here is a presumption that 'counsel's conduct falls within the wide range of reasonable professional assistance.'" Byram v. Ozmint, 339 F.3d 203, 209 (4th Cir. 2003) (quoting Strickland, 466 U.S. at 689).

"[I]n deciding whether [counsel] exercised reasonable professional judgment," we "focus on whether the investigation supporting counsel's decision not to introduce mitigating evidence of [defendant's] background was itself reasonable." Wiggins, 539 U.S. at 522-23 (internal alteration and quotation marks omitted). "Strickland does not require counsel to investigate every conceivable line of mitigating evidence no matter how unlikely the effort would be to assist the defendant at sentencing. Nor does Strickland require defense counsel to present mitigating evidence at sentencing in every case." Wiggins, 539 U.S. at 533. Also,

> [t]he reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions. Counsel's actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant. In particular, what investigation decisions are reasonable depends critically on such information.

Strickland, 466 U.S. at 691.

21

We do not view counsel's investigation of Syriani's background and social history as constitutionally deficient.

First, trial counsel's investigation into Syriani's background was not rendered unreasonable because they failed to locate and interview witnesses in the country of Jordan. Syriani was represented at trial by Mr. John Plumides, who acted as lead counsel, and Mr. Andrew Trakas, who was second chair counsel. Both were experienced trial counsel, particularly Mr. Plumides who had tried capital cases before. At the time of the murder, Syriani was not a recent immigrant to the United States. He and Teresa married in 1974, and he immigrated to this country within several weeks of the marriage. He learned to speak English, and had been living, working, and raising children in the United States for fifteen years when he attacked his wife. Thus, there was no reason for counsel to believe that he would be unable to present a competent mitigation case without traveling to Palestine and Jordan, or sending an investigator there, to interview family members, friends, and co-workers who had known Syriani more than a decade earlier.

Second, Syriani's counsel undertook reasonable efforts to investigate Syriani's cultural background. Mr. Trakas testified that he met with Syriani on a regular basis prior to trial, at least once or twice a week, to discuss various aspects of his case, including an explanation of the two-tier approach to a capital

22

trial.  Mr. Plumides also visited Syriani on a less frequent basis.
Counsel testified that they had a good rapport with Syriani and no
difficulty communicating with him.  Counsel also obtained and
presented information from Syriani's sister Odeet, and interviewed
Syriani's brother when he visited from Jordan.

Finally, it is clear that Syriani's counsel understood and
adequately presented the cultural aspects of the case, and
successfully highlighted their mitigating value.  In particular,
Mr. Plumides demonstrated that he fully understood Syriani's
marriage arrangement and the cultural differences between his life
in Jordan and his life in the United States.[4]  Counsel presented
information about Syriani's unique cultural background to the jury,
through the testimony of Syriani and Odeet.  And, counsel referred
to the differences between Arabic and American culture during his
closing argument to the jury, including reminding the jury of
Syriani's unique difficulty in coping with his wife's adoption of
more American behaviors, such as driving, working outside the home,
and wearing makeup and a more americanized wardrobe.[5]

---

[4]  Indeed, Mr. Plumides had a unique understanding of them.
Mr. Plumides's parents had immigrated to the United States and were
the product of an arranged marriage.

[5]  For example, counsel pointed out that Syriani had "lived
as a very poor man and worked his way up to his own home," that
"[h]e lived in one room in Jerusalem with all his family, all his
brothers and sister[s], and his ill father and mother," that "he
went to work when he was 12 years old," and that he supported his
family and "created a very distinctive sense of pride in his life
style."  J.A. 895.  He highlighted the fact that the changes in

23

In sum, we cannot say that trial counsel's failure to travel to Jordan to interview family members and friends of Syriani from years before, or failure to retain a "cultural expert" to testify as to the effect his Arabic heritage might have had upon his actions during the marriage and on the night he inflicted the fatal wounds upon his wife, constituted ineffective assistance of counsel. Counsel interviewed Syriani and his sister living in the United States, as well as a sibling who visited from Jordan, and presented a great deal of evidence of Syriani's background to the jury. The information presented did not include the details contained in Dr. Khater's affidavit. However, there is no claim that Syriani, Odeet, or the visiting brother conveyed this background information to counsel when they were interviewed. And, it appears that the vast majority of this "undiscovered" evidence came from Syriani himself when he was interviewed by Dr. Akram in preparation for the MAR. In this regard, we note that, while Syriani did not testify at the MAR hearing, he presented no such history in his testimony during the guilt phase or penalty phase. Indeed, in at least one very important respect, Syriani's testimony

---

Teresa prompted Syriani's actions that night, that "[s]he became [a]mericanized" and "started wearing lipstick." J.A. 905. He reminded the jury that, "in their land and their customs, a woman's place was in the home," that "divorce in [Syriani's country] was five percent," "[t]hat the home was secure," and that "[t]hey didn't have divorce." J.A. 905. And, he highlighted the fact that Syriani "couldn't understand why his wife was leaving him, of all things." J.A. 906.

24

at trial conflicts with the background offered through the summaries of other witnesses at the MAR hearing.[6]

However, even if we were to conclude that counsel should have done more in their investigation of this aspect of the case, we would affirm the denial of habeas relief because Syriani failed to demonstrate that there is a reasonable probability that the outcome of the penalty phase would have been different. Counsel presented evidence of Syriani's background and cultural differences and their effect upon his actions that night. The jury unanimously found, as a mitigating factor, that Syriani was raised in a foreign culture. Clearly, the jurors knew and understood the cultural issues involved in this case, and weighed them, but concluded that this did not outweigh the aggravating nature of the attack.

### B.

We turn now to Syriani's assertion that he received ineffective assistance of counsel because counsel failed to investigate and present mitigating evidence that he suffered from various mental health problems related to his background and his problems with cultural assimilation in this country.

---

[6] Syriani did not relate that his father had been taken prisoner and ridiculed after his release, causing him to have to leave school at age twelve to work and support the family in Jordan. Rather, Syriani testified when he was twelve years old, his father developed cancer and could no longer work and, because Syriani was the oldest boy, he had to quit school to support the family.

Prior to trial, counsel arranged for Syriani to undergo a competency examination at Dorothea Dix Hospital by Dr. James G. Groce. Syriani was admitted on October 11, 1990, and remained there until his discharge on October 24, 1990. At the conclusion of the evaluation, Dr. Groce determined that Syriani suffered from an adjustment disorder with depressed mood, but noted no other psychiatric diagnoses. According to Dr. Groce, Syriani was "frustrated, jealous and depressed during the period of time that he was separated from his wife," but that "he would have been able to understand the nature and quality of his actions and the difference in right and wrong at the time in question." J.A. 2158. Dr. Groce related that his evaluation and diagnosis were based on "interviews with the patient, the result of physical examination, laboratory studies, observation of his ward behavior during the time that he was in the hospital and information received from the patient's attorney, the clerk of court, the county jail, the patient's mother and an investigating detective." J.A. 2156. At no time did Dr. Groce contact trial counsel or request any additional information that may have been necessary to complete the evaluation.

Mr. Plumides testified that, after reviewing the report and independently researching the diagnosis, he made the decision not to request additional evaluations or call Dr. Groce as a witness. Given Dr. Groce's opinions regarding Syriani's ability to

26

understand his actions that night, he believed that Dr. Groce's testimony regarding Syriani's depressed nature would hurt Syriani more than help him at trial.

Syriani contends that trial counsel was ineffective and that this decision not to do more was based on an incomplete investigation. Specifically, Syriani points to the fact that trial counsel did not contact Dr. Groce to discuss his findings, request the entirety of the file from Dorothea Dix Hospital, or provide Dr. Groce with any information concerning Syriani's cultural background. Syriani also points to the fact that trial counsel was aware that, shortly after Syriani was arrested, he told his son John that his "brain had blown up," told his daughter that he had "gone crazy," and told another individual that he "had lost control" at the time of the crime. J.A. 2114-15. Syriani asserts that competent counsel, armed with this information, would have requested additional information and evaluation from Dr. Groce and would have asked Dr. Groce to explore potential mitigating circumstances related to Syriani's mental condition, or obtained a separate psychological evaluation for purposes of uncovering mitigating evidence.

To demonstrate the mitigating evidence that such an investigation would have uncovered, Syriani points to the evaluation performed by Dr. Robert Rollins, who is also with Dorothea Dix Hospital, in preparation for the post-conviction

27

hearing. Dr. Rollins reviewed the records of Dr. Groce, an affidavit prepared by Dr. Khater concerning Syriani's cultural background, and interviewed Syriani on two occasions. According to Dr. Rollins, Syriani had (1) mild symptoms of post traumatic stress disorder related to events in his childhood and to "the distressing feelings regarding the death of his wife," J.A. 2010; (2) rigid beliefs and behavior which he characterized as a personality disorder that narrowed the range of choices available to Syriani when dealing with a situation and which affected his judgment and behavior control; and (3) an adjustment disorder or depression related to the disintegration of his family. In addition, Dr. Rollins noted that, while not separate diagnoses, Syriani was having relational problems and a cultural problem reflected by his view of the appropriate roles of husband and wife and his inability to cope with the changes in this relationship. According to Dr. Rollins, "Syriani felt very strongly that he was responsible for the behavior of his wife and children and he was actually quite ashamed that they didn't behave as he wished." J.A. 2025.

Syriani argues that if trial counsel had requested a mental health evaluation for purposes of mitigation evidence, as opposed to just for a competency determination, they would have discovered these mental and emotional problems and, had they presented this evidence to the jury, there is a reasonable probability that the jury would not have sentenced Syriani to death.

28

The state MAR court rejected this claim of deficient performance, ruling that trial counsel had arranged to have Syriani examined by a mental health expert, evaluated that report along with the information provided by Syriani, and made the "reasonable strategic decision not to call Dr. Groce as a witness because they considered that he would do more harm to their case than good." J.A. 2374. Having received an opinion that Syriani suffered only from an "'adjustment disorder with depressed mood'" and "having used their own professional judgment in evaluating defendant's statements to them and the evidence against defendant," the state MAR court concluded that "trial counsel had no obligation to shop around for additional opinions of mental health experts." J.A. 2374 (internal quotation marks omitted). In addition, the state MAR court ruled that Syriani had failed to demonstrate that he was prejudiced by the alleged deficiencies of counsel. The district court ruled that trial counsel's representation was not deficient performance and, consequently, did not address the second prong of Strickland.

In his testimony, Dr. Groce made it clear that he was only retained to prepare a competency evaluation, and that he was at no time charged with the task of evaluating Syriani's mental health status for purposes of mitigation evidence. Had he been retained to perform the latter task, Dr. Groce testified, he would have ordered an additional battery of tests. Accordingly, we are not

29

convinced that trial counsel's efforts to uncover this type of mitigating evidence was reasonable. However, we need not decide whether the state court's determination to the contrary was an unreasonable application of the first prong of Strickland because we are satisfied that there is no reasonable probability that, had the jury been aware of the information presented by Dr. Rollins during the MAR proceeding, the result of Syriani's sentencing proceeding would have been different.

To establish a Sixth Amendment violation, Syriani was required to show that any failure on the part of his trial counsel prejudiced his defense. To establish this necessary prejudice, Syriani had to demonstrate "'that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" Wiggins, 539 U.S. at 534 (quoting Strickland, 466 U.S. at 694). In the death penalty context, to assess prejudice, the court "reweigh[s] the evidence in aggravation against the totality of the available mitigating evidence." Id. Prejudice requires "a reasonable probability that at least one juror would have struck a different balance." Id. at 537.

The aggravating evidence in this case was particularly compelling. While subject to a protective order arising from earlier incidents of domestic violence, Syriani blocked his wife

30

and son's path to their home with his van, approached the vehicle, and chased Teresa as she attempted to get away from him by placing the car in reverse. He then opened the driver's door, and brutally stabbed his wife with a screwdriver in the head and face, while their ten-year-old son was in the passenger seat and over his attempts to protect his mother from this brutal onslaught. The evidence revealed that the assault was prolonged and calculated. After John ran for help, he and his friend returned to help his mother, only to find Syriani still stabbing Teresa. According to Mr. Wilson, at one point Syriani crossed the street, returned to his van, fumbled with something, and then returned to Teresa's vehicle to continue the attack. And, Mr. O'Connor's testimony suggests that Syriani intended to go back a third time to resume his assault upon Teresa, but changed his mind when he saw O'Connor approaching Teresa's vehicle.

As noted by the North Carolina Supreme Court, the pain and suffering to Teresa and her children was extraordinary:

> [D]efendant stabbed his victim twenty-eight times. While many of the wounds were to [Teresa's] face and neck, several were to her arms and hands, suggesting that she tried to defend herself or ward off the blows. Further, one wound penetrated her brain three inches, causing hemorrhaging and swelling in the brain. Another blow fractured her jaw and several of her teeth. These blows did not cause immediate death. The victim was able to communicate with her daughter Rose moments after the attack, and, as well, with the attending emergency room assistant upon her arrival at the hospital. Further, a tube was

31

placed through her nose to her lungs to assist her breathing. She died twenty-eight days later as a result of the three-inch puncture wound to her brain, after having suffered stroke, infarct or paralysis. Defendant correctly assesses the record as devoid of expert testimony that his victim suffered "inordinate" pain, but notwithstanding, the jury could reasonably infer from this evidence that the victim sustained and endured agonizing physical pain before becoming unconscious or comatose. Further, this evidence supports a finding that the killing was excessively brutal and conscienceless, pitiless and unnecessarily torturous. . . .

Additionally, the evidence that defendant had abused his wife to the extent that she had left the house with her children; that he had threatened to kill her should she ever leave him; that only two weeks prior to the killing she had an ex parte domestic violence order served on defendant, requiring him to leave their home, and that defendant had tried to talk to her or the children, which overtures she had rebuffed, suggests that she feared her husband. The jury could reasonably infer that the victim, upon seeing defendant's van that night, being blocked by the van, observing his getting out and shaking his fist at her, and then attacking her as she tried to reverse the car, suffered and endured psychological torture or anxiety not only for herself but for her young son who was sitting beside her trying to stop his father.

Syriani, 428 S.E.2d 141-42 (citations omitted).

For his part, Syriani, after brutally assaulting his wife in the presence of his son, called his son a bastard as he left, drove to a nearby fire station to seek medical treatment for his minor injuries, requested that the police take him to the emergency room to be treated for his minor injuries when they arrived at the fire

32

station to arrest him, and told the firemen and the emergency room physicians that Teresa had assaulted him.

Weighed against this aggravating evidence, Syriani advances evidence that he was raised in poverty, suffered from mild post-traumatic stress disorder (caused by his upbringing or his murder of his wife or both), depression, and difficulty coping with the americanization of his wife and break-up of their marriage, which Dr. Rollins classifies as "personality disorders" affecting his ability to control his behavior.

The evidence presented at the MAR hearing was more extensive than that presented during the trial. But it is not so drastically different from that which the jury actually did consider and weigh as to lead us to conclude that the result might have been different. As a result of the efforts of defense counsel presented with a very difficult case, the jurors were made aware that Syriani was raised in a unique cultural setting and that he was subject to mental and emotional disturbances at the time of the murder. Indeed, the jury <u>unanimously</u> found, as mitigating factors, that Syriani had been raised in a different culture and that he committed the murder while he was under the influence of mental or emotional disturbance. Seven members of the jury found, as a mitigating factor, that Syriani was aggravated by events following the issuance of the <u>ex</u> <u>parte</u> domestic order. And, several of the jurors found that Syriani understood the severity of his conduct,

33

had demonstrated an ability to abide by lawful authority since his incarceration, had a history of good work habits, had a history of being a good family provider, and had been a person of good character or reputation in the community in which he lived. The jury unanimously rejected, however, as mitigating circumstances that Syriani had no significant history of prior criminal activity, and that Syriani had demonstrated remorse for his actions.[7]

In short, Syriani's jurors were obviously aware of the cultural and social aspects underlying the murder, as well as the emotional and mental deficiencies associated with it, and unanimously found these factors to be mitigating in character. Yet, weighed against the aggravating evidence, they unanimously found that these mitigating circumstances, coupled with any others, did not outweigh the aggravating circumstances and recommended a sentence of death. In light of the totality of the evidence presented at trial and in the state habeas proceeding, we conclude that Syriani has failed to demonstrate a reasonable probability

---

[7] Syriani denied having ever abused his children or his wife, and attempted to convey to the jury a scenario in which he "snapped" out of concern for his wife and children and fear that he was losing his family in the divorce. His children testified about their father's history of having a violent temper and his abuse of their mother and the children, as well as of the incident when the police took Teresa and the children to a battered women's shelter. Trial counsel introduced evidence that Syriani had no prior criminal convictions, either in his home country or in the United States. However, the State argued to the jury that they should reject this mitigating factor based upon the testimony that Syriani had been abusive to his family.

that, but for counsel's failure to present the additional evidence of Syriani's cultural, social, and mental background, his sentence would have been different. Syriani, therefore, has failed to establish that he suffered prejudice from the alleged deficient conduct of counsel.

## IV.

For the foregoing reasons, we affirm the district court's denial of Syriani's petition for writ of habeas corpus.

<u>AFFIRMED</u>

35