Patrick Lane **MOODY**, Petitioner–Appellant,

v.

Marvin **POLK**, Warden, Central Prison, Raleigh, North Carolina, Respondent–Appellee.

No. 04–21.

United States Court of Appeals, Fourth Circuit.

Argued: March 17, 2005.

Decided: May 12, 2005.

---

**ARGUED:** Donald Joseph Willey, Jefferson, North Carolina, for Appellant.

Edwin William Welch, Special Deputy Attorney General, North Carolina Department of Justice, Raleigh, North Carolina, for Appellee. **ON BRIEF**: Roy Cooper, North Carolina Attorney General, Raleigh, North Carolina, for Appellee.

Before WILKINSON, LUTTIG, and TRAXLER, Circuit Judges.

Affirmed by published opinion. Judge LUTTIG wrote the opinion, in which Judge WILKINSON joined. Judge TRAXLER wrote a separate opinion concurring in the judgment.

## OPINION

LUTTIG, Circuit Judge.

Appellant Patrick Lane Moody was convicted of capital murder and sentenced to death by a North Carolina state court. In a state post-conviction proceeding, Moody alleged, *inter alia,* that his trial counsel rendered ineffective assistance at sentencing. The state court denied relief to Moody, and the district court dismissed Moody's subsequent section 2254 petition. We granted a certificate of appealability to review Moody's claim. Because we conclude that the state court's decision was neither contrary to nor an unreasonable application of *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), we affirm.

### I.

Moody was indicted in January 1995 for the first degree murder of Donnie Ray Robbins. J.A. 35. He initially entered a plea of not guilty. On July 14, 1995, during the state's presentation of evidence at his trial, Moody changed his plea to guilty. The state's evidence tended to show the following:

In July 1994, defendant started having an affair with Wanda Robbins (Wanda),

the wife of the victim, Donnie Robbins. Over the course of their affair, defendant and Wanda discussed various plans to murder Wanda's husband and share the insurance proceeds. On 16 September 1994, defendant went to Loman's Trailer Park in Thomasville, North Carolina, to the home of Donnie and Wanda Robbins. Defendant identified himself as Darryl Thompson and pretended to be interested in buying Donnie's old Chevrolet automobile. He and Donnie went to a field near the trailer park where the automobile was located. Defendant asked Donnie to measure the automobile, purportedly to determine whether it would fit on a "roll-back" truck. As Donnie leaned over the hood of the automobile to measure it, defendant shot him in the back of the head with a .32 caliber semiautomatic pistol he had stolen the previous day from a house near the trailer park.

*State v. Moody,* 345 N.C. 563, 481 S.E.2d 629, 631–32 (1997).

During the sentencing hearing, the state presented evidence that Wanda Robbins had sought to complete the paperwork necessary to receive insurance benefits for her husband's death early the morning after the murder, supporting the inference that the murder was committed for pecuniary gain. *Moody,* 481 S.E.2d at 632. The state also introduced evidence that Moody had been previously convicted in Florida of attempted first-degree murder and conspiracy to commit first-degree murder. *Id.*

In mitigation, Moody's counsel presented testimony from Steve Ervin, an ordained minister with a religious group called "His Laboring Few Biker's Ministry." *Id.* at 632. Ervin testified that Moody had been involved with the group in the time preceding the murder, but that

his involvement diminished after he met Wanda. *Id.*

In addition, defendant's mother and half-brother testified as to Moody's "traumatic and abusive childhood." *Id.* Carl Jacobs, Moody's half-brother, testified that Moody's father abused Moody when he was a young child, beating him with a board, breaking plates over his head, and locking him in his room without meals for up to eighteen hours. S.J.A. 462–65. Jacobs also testified that when Moody was 17, he temporarily moved in with Jacobs to avoid the abuse. S.J.A. 466. Janice Wandel Moody ("Janice"), Moody's mother, testified that Moody's father punished Moody in order to hurt Janice, and that Moody told her that he was abused by his father. S.J.A. 486. Jacobs did not see Moody at all between the time that Moody was 4 or 5 years old and when Moody moved in with him at age 17; Janice saw Moody infrequently over that time period. S.J.A. 468–69, 485, 493.

Defense counsel also offered the testimony of Dr. Jerry Wayne Noble, a clinical psychologist. S.J.A. 313–14. Dr. Noble testified that Moody had told him that he had suffered physical abuse as a child. Dr. Noble also testified that a neighbor had contacted Social Services when Moody was a child to report that Moody was abused. S.J.A. 331. Dr. Noble diagnosed Moody as suffering from Attention Deficit Hyperactivity Disorder, borderline intellectual functioning (with I.Q. scores ranging from 74 to 82), alcohol dependence, a mixed personality disorder, child abuse syndrome, and physical problems resulting from psychological difficulties. S.J.A. 351–58.

Moody also testified on his own behalf at sentencing. He admitted killing the victim but denied that he did it for insurance money. He testified that he killed Donnie Robbins because Wanda Robbins threat-

ened to turn him in to the police on outstanding Florida warrants if he did not commit the murder. S.J.A. 535.

The jury unanimously found two aggravating factors: that Moody "has been previously convicted of a felony involving the use or threat of violence to the person" and that "the capital felony was committed for pecuniary gain." J.A. 379. One or more jurors considered the following factors to be present and mitigating: the murder "was committed while the defendant was under the influence of mental or emotional disturbance"; "the defendant acted under the domination of another person"; "the defendant aided in the apprehension of another capital felon"; "Moody was physically and verbally abused by his father during his formative years"; "Moody suffered during his childhood and adolescent years as a result of the lack of love and nurturing from his father and step-mother"; and "Moody was deceived by Wanda Robbins . . . to believe that she . . . was being physically abused by Donnie Ray Robbins." J.A. 379.

The jury recommended and the trial court imposed the death penalty. *Moody,* 481 S.E.2d at 631. Moody's conviction and sentence were upheld on direct appeal. *Id.*

In his state post-conviction proceedings, Moody alleged, *inter alia,* that his trial counsel were constitutionally ineffective for failing to perform an adequate mitigation investigation, failing to adequately prepare Dr. Noble for his testimony, and failing to introduce evidence pertaining to the aggravating factor of Moody's prior conviction for attempted murder. The state MAR court denied relief, J.A. 35–119, as did the district court. J.A. 335–467. We issued a certificate of appealability to review Moody's claim that his counsel rendered ineffective assistance at sentencing.

## II.

Because the North Carolina state court rejected Moody's claim on the merits, our review is constrained by the Antiterrorism and Effective Death Penalty Act (AEDPA). Moody seeks relief exclusively under section 2254(d)(1), which permits us to grant the writ of habeas corpus only if the state court adjudication resulted in "a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1).

A decision is "contrary to" Supreme Court precedent if "the state court applies a rule that contradicts the governing law set forth in our cases." *Terry Williams v. Taylor*, 529 U.S. 362, 405, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). Here, the state court correctly identified *Strickland* as the case governing claims that counsel has rendered ineffective assistance of counsel, and correctly recognized that, in order to satisfy the performance prong of *Strickland*, Moody must demonstrate "that his counsel's performance fell below an objective standard of reasonableness." J.A. 79 (quoting *State v. Morganherring*, 350 N.C. 701, 517 S.E.2d 622, 633 (1999)).

■ However, the state court also required that Moody demonstrate prejudice under *Strickland* by proving "that his counsel's deficient representation was so serious as to deprive him of a fair trial."

J.A. 79 (quoting *Morganherring*, 517 S.E.2d at 633). The state court cited this court for the proposition that "we cannot grant relief solely because the outcome would have been different absent counsel's deficient performance. *Instead, we can only grant relief under the second prong of Strickland if the 'result of the proceeding was fundamentally unfair or unreliable.' "* J.A. 46 (quoting *Sexton v. French*, 163 F.3d 874, 882–84 (4th Cir.1998))(internal citations omitted)(emphasis in state court opinion). The Supreme Court, however, has rejected the requirement that a petitioner prove that counsel's deficient performance rendered the proceeding "fundamentally unfair," because *Strickland* requires only a showing that, but for the unreasonable performance, there is a reasonable probability that the result of the proceeding would have been different. *Terry Williams*, 529 U.S. at 391, 120 S.Ct. 1495. *See also Tucker v. Catoe*, 221 F.3d 600, 608 (4th Cir.2000) (recognizing that the Supreme Court has "dismissed the idea that we must separately inquire into fundamental fairness even if a petitioner is able to show that his lawyer was ineffective and that the ineffectiveness probably affected the outcome of the proceeding"). The state court's analysis of the prejudice prong was therefore contrary to *Strickland*, though its analysis of the performance prong was *not* "contrary to" *Strickland*.[1]

---

1. The state court did, at times, cite the appropriate prejudice standard, and ultimately held *both* that "there is no reasonable probability that the jury's balancing of aggravating and mitigating circumstances would have been different if they had been presented the additional evidence developed by postconviction counsel" *and* that "the evidence developed by postconviction counsel does not undermine the Court's confidence in the reliability and appropriateness of the sentence adjudged." J.A. 89. Nevertheless, *Terry Williams* confirms that the state court's prejudice analysis was contrary to *Strickland*. *See Terry Williams*, 529 U.S. at 414, 120 S.Ct. 1495 (O'Connor, J., concurring) (rejecting Chief Justice Rehnquist's dissenting defense of the state court's decision, which had reached conclusions under both the proper and improper standard, because "it is impossible to determine ... the extent to which the Virginia Supreme Court's error with respect to its reading of *Lockhart* affected its ultimate finding").

■ Ordinarily, when a state court decision is "contrary to" governing Supreme Court law, we engage in *de novo* review of the prisoner's claim. *Rose v. Lee*, 252 F.3d 676, 689–90 (4th Cir.2001). Here, however, the state court provided two alternative, independently sufficient grounds for its holding—only one of which relied on a rule of law "contrary to" Supreme Court case law. An error in a state court's analysis does not render the state court's decision contrary to or an unreasonable application of Supreme Court precedent when that analysis is not necessary to the state court's resolution of the claim. Rather, because the state court's holding on the issue of performance would alone suffice to defeat Moody's ineffective assistance claim, the *decision* of the state court would only be contrary to or an unreasonable application of *Strickland* if the state court's evaluation of *both* prongs were deficient under this standard. Therefore, we review the state court's decision of the performance prong of the

*Strickland* inquiry under the deferential AEDPA standard. Because the state court applied the wrong standard to evaluate prejudice, we do not defer to its analysis of that prong but instead review it *de novo*. See *Syriani v. Polk*, No. 04–12, 118 Fed.Appx. 706, 713–14 (4th Cir. Dec. 21, 2004)(unpublished).[2]

### III.

Moody claims that his counsel were ineffective because they failed to perform an adequate investigation into mitigation, because they did not adequately prepare Dr. Noble for his mitigation testimony, and because they unreasonably failed to present evidence to undermine the state's case in aggravation. As to each of these claims, we affirm the district court's conclusion that the state did not unreasonably apply *Strickland* when it found counsel's performance to be reasonable. And, reviewing each claim *de novo* on the issue of prejudice, we conclude that, to the extent

---

**2.** Our decision in *Rose v. Lee*, 252 F.3d 676 (4th Cir.2001), does not foreclose such. In *Rose*, the state MAR court had concluded that counsel's decision not to further investigate and present evidence that defendant suffered from severe sexual disorders was a "tactical decision" that was consistent with *Strickland*. Appellant's Brief at *10, *Rose v. Lee*, 252 F.3d 676 (4th Cir.2001) (No. 00–11(L)), 2000 WL 33990677. The state MAR court had, however, incorrectly held that the defendant had to show by a preponderance of the evidence that the result of the proceeding would have been different absent the errors. *Rose*, 252 F.3d at 689. The district court believed it did not have the authority to conduct a *de novo* review of the ineffective assistance claim, but instead had to grant the writ and remand to the state habeas court for application of the proper *Strickland* standard. *Id.* at 680, 689, 104 S.Ct. 2052.

On appeal, we addressed the question of whether "a federal court lacks authority to conduct an independent review of [a] claim" to which the state court applied the incorrect law. *Id.* at 688, 104 S.Ct. 2052. We an-

swered this question by holding that, when the state court applies law contrary to Supreme Court precedent, we have an "obligation to review state court judgments independently to determine whether issuance of a writ is warranted." *Id.* at 690, 104 S.Ct. 2052. We then proceeded to address the entire claim *de novo*. We did not expressly address or consider the argument that the fact that each prong of *Strickland* independently defeats recovery requires us to apply a deferential standard on the performance prong and a *de novo* standard on the prejudice prong, as the state conceded that the state court's adjudication of the *Strickland* claim was "contrary to" *Strickland*. *Id.* at 689, 104 S.Ct. 2052. Moreover, our conclusion that the state court's performance determination survived *de novo* review necessarily implies that this determination would have survived a more deferential review. Accordingly, as we concluded in *Syriani*, Moody must establish that the state court's performance determination was an unreasonable application of federal law.

that any of the challenged actions were unreasonable, they nevertheless did not prejudice Moody.

### A.

#### 1.

Moody first alleges that counsel's overall mitigation investigation was insufficient. Under *Strickland,* "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland,* 466 U.S. at 691, 104 S.Ct. 2052. Any particular decision not to investigate must thus "be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Id.* In particular, Moody claims that counsel's meetings with him were unreasonably infrequent during their investigation into mitigation and that counsel unreasonably failed to investigate family history sufficiently because they did not immediately contact Moody's half-brother, Fred Mayle, upon receiving his contact information.

We disagree with Moody's contention that counsel's investigation was unreasonable. Counsel Charles Harp was appointed on January 30, 1995, and counsel Jon Myers was appointed on February 13, 1995. J.A. 274, 282. Prior to the commencement of Moody's trial on July 10, 1995, Harp met with Moody on two occasions, March 29 and July 9. J.A. 274. Myers met with Moody on June 14, July 4, and July 9. J.A. 282. Counsel filed affidavits on post-conviction review asserting that the first time either of them asked Moody about his family history was during the June 14 meeting, where "defendant withheld information from his trial counsel about his family members and expressed a desire not to have his family members either advised about his trial or involved in his trial." J.A. 97. During the July 4 meeting, apparently in response to further questioning about his family history, Moody "falsely report[ed] that his father had been killed in a car accident," J.A. 97–98, but also provided Myers with contact information for his half-brother, Fred Mayle. J.A. 283. Myers did not attempt to contact Mayle until July 15, after Moody's trial had begun and after Moody had changed his plea, and two days before the beginning of the sentencing trial. Mayle informed trial counsel that Moody's parents were alive and lived in Ohio. Trial counsel contacted Moody's family members the following day and were able to convince Moody's mother and half-brother to testify on his behalf. J.A. 283.

As to Moody's claim that his counsel did not meet with him frequently enough, there is no established "minimum number of meetings between counsel and client prior to trial necessary to prepare an attorney to provide effective assistance of counsel." *United States v. Olson,* 846 F.2d 1103, 1108 (7th Cir.1988). If Moody had told the truth at the meetings he had with counsel, counsel could have pursued the leads he gave them and acquired all available mitigating evidence. Because of Moody's dishonesty to his own counsel, however, counsel were limited in their possibilities for mitigation investigation.[3] The Supreme Court has recognized that "[t]he reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or ac-

---

**3.** Moody attempts to justify his dishonesty on the grounds that he did not have an opportunity to develop trust in his attorneys and that he had subnormal intelligence and dealt with people in a suspicious manner. Br. of Appel-

lant at 31. But the mere *fact* that Moody was dishonest, regardless of the *reasons* for that dishonesty, justified counsel's decision not to rely on Moody as a source of mitigating evidence.

tions." *Strickland,* 466 U.S. at 691, 104 S.Ct. 2052. And "when a defendant has given counsel reason to believe that pursuing certain investigations would be fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable."[4] *Id.* Given that Moody was unwilling to give his counsel any productive leads at the June 14 meeting, and that counsel knew that he was lying to them and that he was "a poor and unreliable historian," J.A. 282–83, counsel could reasonably have determined that further meetings with Moody were not helpful in preparing his defense. *See* J.A. 97–98.

Counsel's limited meetings with Moody were also sufficient in light of the other evidence they gathered from him. Dr. Noble testified that he spent approximately 60–70 hours evaluating Moody, including approximately 12 hours spent interviewing and testing Moody. J.A. 396. The state court could thus reasonably conclude that counsel made a reasonable decision to allocate their own time to other means of investigation, based on a belief that Dr. Noble would be more qualified to obtain relevant evidence from Moody and to provide that evidence to counsel. *See* J.A. 97–98.

■ Moody also argues that, as part of an investigation into family history, coun-

sel should have called his half-brother Fred Mayle immediately upon becoming aware, on July 4, that he existed and lived in Florida, which in turn would have given counsel more time to contact the family members who Mayle identified. Because counsel *did* ultimately contact Mayle on July 15, we do not have to find that it would have been reasonable not to contact him at all, but only that the state court could reasonably have concluded that the failure to contact him *immediately* was a reasonable decision. Myers' notes reflect that Moody told him that Mayle "was around [Moody] until age 4–5 and didn't see him again until age 18." J.A. 290. Myers thus could have assumed that Mayle would have limited evidence to provide about Moody's family background during most of his formative years. Additionally, counsel could have suspected that Mayle would be unlikely to identify other family members who could be helpful in mitigation, as counsel had been told *by Moody* that Moody's father was deceased and that he did not want his family to know of his trial.

These representations by Moody would not cause reasonable counsel to prioritize contacting Mayle. Likewise, counsel had acquired extensive evidence of Moody's family background from Dr. Noble, who had interviewed Moody, examined his

---

**4.** The Supreme Court has adopted no exception to this statement to encompass the concurrence's apparent belief that defense counsel may not rely on the defendant's statements unless counsel have "fulfill[ed] their obligation to explain to their client the capital process and the importance of mitigating evidence in a penalty phase." *Post* at 158–59. Regardless of whether Moody had sufficient information to make "informed strategic choices," the information regarding his family was undoubtedly "information supplied by the defendant" on which counsel could "quite properly" base their decisions. *See Strick-*

*land,* 466 U.S. at 691, 104 S.Ct. 2052; *post* at 158. Despite the concurrence's statement that "[t]here is absolutely no indication that Moody gave counsel reason to believe that pursuing an investigation into his family history and social background would be fruitless or harmful to the case in mitigation," *post* at 158, it is clear that Moody's request that his family members not be contacted, in connection with his representation that his father was deceased and his stepbrothers and stepsister "would turn [their] own parents in," J.A. 290, could indicate to reasonable counsel that attempting to utilize Moody's family members in mitigation would be fruitless.

school records, reviewed reports concerning child abuse, reviewed medical and psychiatric treatment records, and interviewed witnesses. S.J.A. 316. The state court's conclusion that counsel performed a reasonable investigation into family history was thus a reasonable application of *Strickland.* *See* J.A. 105.

### 2.

▆ Moody next argues that his counsel's *presentation* of mitigating evidence was unreasonable, because counsel permitted Dr. Noble to testify on the basis of an outline of his examination of Moody that included areas where he had substantial doubts about the veracity of information provided to him by Moody and reflected Dr. Noble's doubts about those areas with question marks. Br. of Appellant at 32–33. He alleges that because Harp admits that he knew that Dr. Noble was basing his expert opinions largely on incorrect or unverified information, Harp was ineffective for not attempting to correct this problem, either by requesting a continuance from the trial court or by seeking further information. *Id.* at 34. When the outline was made available to the prosecution, Moody claims that the prosecution used it to fatally attack Dr. Noble's credibility.

We disagree. Dr. Noble's incomplete or inaccurate information was not a result of a limited investigation, but a direct result of Moody's dishonesty. Moody cannot lie to his expert psychologist and then claim ineffective assistance because his attorneys did not seek evidence to disprove his lies so that they could be removed from the expert's outline. *See Thomas v. Taylor,* 170 F.3d 466, 471 (4th Cir.1999) ("In view of appellant's repeated assertions that he

fired both shots, trial counsel was under no obligation to investigate further the possibility that appellant did not fire the second shot," even though appellant told his court-appointed expert that he did not fire the second shot). To the extent that Dr. Noble's credibility was undermined because of inaccuracies in his testimony, *Moody,* not counsel, is responsible for that consequence.

Moody appears to allege two possible courses of action counsel could have taken to render reasonable performance with respect to Dr. Noble's testimony: counsel could have ensured that the outline had all information of questionable veracity removed from it or counsel could have requested a continuance to allow Dr. Noble more time to confirm the information he had gathered.

▆ That the content of the outline itself was not consistent with Moody's present wishes is no fault of trial counsel. Dr. Noble, not trial counsel, had ultimate responsibility for his own expert report. And Dr. Noble informed trial counsel when he faxed them the outline that "I will be doing my own last revisions and additions later this morning." J.A. 294. Counsel bears no responsibility for Dr. Noble's failure to finalize his outline in a form that did not include information about which he had doubts.[5] To the extent that Moody raises a claim that Dr. Noble was ineffective, we reject that claim because we have consistently " 'rejected the notion that there is either a procedural or constitutional rule of ineffective assistance of an expert witness, rather than ineffective assistance of counsel.' " *Wilson v. Greene,* 155 F.3d 396, 401 (4th Cir.1998); *see also Thomas,* 170 F.3d at 472.

---

**5.** That Dr. Noble noted that "Annotations from [Myers] and [Harp] would be helpful in completing my final version" does not shift

from Dr. Noble to counsel the responsibility for testifying from an appropriate outline. J.A. 294.

■ Nor was it unreasonable performance for trial counsel to fail to seek a continuance upon discovering that Dr. Noble was uncertain about the veracity of some of the information he had gathered. Counsel were entitled to rely on Dr. Noble's representation that he would complete a final version of the outline; absent any indication from Dr. Noble that he needed more time, counsel had no reason to request such time. Nor is Moody able to demonstrate that the state court would have been likely to grant a continuance in the circumstance where the defendant's own dishonesty and the psychologist's inexplicable failure to finalize his outline gave rise to the need for delay; indeed, the state MAR court concluded that the trial court would likely not have continued the case. J.A. 99–100. Without evidence that reasonable counsel would have believed a continuance stood a realistic chance of being granted, Moody cannot demonstrate that reasonable counsel would necessarily have requested a continuance. *See Murray v. Maggio,* 736 F.2d 279, 283 (5th Cir.1984) ("Counsel is not required to engage in the filing of futile motions.").

Moody also appears to allege that, if counsel appropriately proceeded with the outline in its incomplete form, they nonetheless erred by eliciting from Dr. Noble information about his uncertainties and Moody's dishonesty. But counsel could reasonably have concluded that such information would be far less harmful if introduced by them than it would be if the prosecution first highlighted Moody's dishonesty.

■ The state court's rejection of Moody's attacks on counsel's actions surrounding Dr. Noble's testimony was thus reasonable.

### 3.

Finally, Moody alleges that counsel were ineffective in their failure to introduce evidence to undermine the state's case in aggravation. The state presented evidence that Moody had been convicted in Florida of attempted first degree murder and conspiracy to commit first degree murder. *Moody,* 481 S.E.2d at 632; S.J.A. 277–79. In the Florida case, Moody had apparently been hired by Maria Rickard to kill Sheilagh Rickard. J.A. 280–81. Sheilagh sent a letter to the Florida court arguably requesting leniency for Moody, whom she viewed as less culpable than Maria. *Id.* Moody now alleges that his trial counsel should have introduced Sheilagh's letter or testimony by Sheilagh herself to mitigate the impact of Moody's conviction.[6]

■ Because Sheilagh's letter is "a double-edged sword that might as easily have condemned [Moody] to death as excused his actions," *Byram v. Ozmint,* 339 F.3d 203, 210 (4th Cir.2003), we disagree with this contention as well. Moody focuses on particular language from the letter, such as where Sheilagh states that she "do[es] not feel that [Moody] is as guilty as Maria Rickard.... [Rickard] did not change her mind and let me live, that was Patrick Moody's decision." J.A. 280. However, the letter also reveals the extensive emotional impact that Moody's crime had on Sheilagh, who told the court that

---

**6.** Harp asserts in his post-conviction affidavit that the decision not to present Sheilagh's statements "was not a tactical decision on my part." J.A. 277. Because the purpose of the guarantee of effective assistance in the Sixth Amendment is " 'simply to ensure that criminal defendants receive a fair trial,' " the Su-

preme Court has recognized that "[t]he relevant question is not whether counsel's choices were strategic, but whether they were reasonable." *Roe v. Flores–Ortega,* 528 U.S. 470, 481, 120 S.Ct. 1029, 145 L.Ed.2d 985 (2000) (quoting *Strickland,* 466 U.S. at 689, 104 S.Ct. 2052).

"[t]hese past eight months have been harrowing enough for me and I am so afraid that when I am in Court that I will once again be overcome with emotion as I was at the sentencing of Patrick Moody." *Id.* Sheilagh also made statements that could lead a jury to conclude that Moody was fully to blame for the earlier crime; she notes, for example, that "I cannot in my mind make him more guilty than Maria, *even though he was with Maria and Gerald when they bought the gun . . .* for what was to be the second attempt on my life." *Id.* at 281 (emphasis added). Given the potential that this letter would only have highlighted the amount of damage that Moody had done to Sheilagh and the fact that Moody had *not* "changed his mind" with respect to killing Robbins, it is impossible to say that counsel were unreasonable not to submit the letter to the jury.

Moody also implies that Harp should have taken steps to secure Sheilagh's testimony at Moody's trial after she abandoned her initial agreement to testify. *See* J.A. 101–02. But it is clear that offering Sheilagh's testimony would have presented the same risks as offering the letter. Because Sheilagh might well have changed her view of Moody upon discovering that he did follow through with a murder, her testimony would have been even more risky than the presentation of the letter. The state court was certainly not unreasonable to conclude that forcing Sheilagh, who had become very emotional at Moody's first trial, to testify in the present case could have harmed rather than helped Moody, and thus that it was not unreasonable to fail to do so.

Because Moody has failed to demonstrate that the state court's conclusion that his counsel rendered reasonable performance was an unreasonable application of *Strickland,* he is not entitled to relief.

## B.

Even if Moody could establish that his counsel performed unreasonably, he is not entitled to relief because he has failed to demonstrate the prejudice required by *Strickland. Strickland,* 466 U.S. at 694, 104 S.Ct. 2052. As noted above, we review the state court's resolution of this claim *de novo.*

Moody alleges that, had each of the errors he claims been remedied, the jury would have viewed the aggravating circumstance of his prior conviction as less damaging, would have valued Dr. Noble's testimony in mitigation to a greater extent, and would have been able to receive more evidence to confirm that Moody was abused as a child. Moody thus claims that when "we reweigh the evidence in aggravation against the totality of available mitigating evidence," we must conclude that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Wiggins v. Smith,* 539 U.S. 510, 534, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003).

We disagree. We do not believe that there is a reasonable likelihood that the jury's verdict would have been different absent counsel's purportedly unreasonable performance. As to aggravation, the Rickard letter, as we noted above, was double-edged, and it is unclear that it would have benefitted Moody in the eyes of the jury. Indeed, by emphasizing the tremendous damage Moody had inflicted on another victim and the degree of his participation in an earlier, very similar contract killing conspiracy, the letter would most likely have *increased* Moody's chances of receiving the death penalty.

As to evidence in mitigation, Moody alleges that Dr. Noble's use of an outline with inaccurate or incomplete information,

marked by question marks, resulted in a cross-examination that discredited Dr. Noble in the eyes of the jury. In support of this allegation, Moody notes that the jury rejected several mitigating factors to which Dr. Noble testified.[7] Each of the mitigating factors highlighted by Moody, however, is a non-statutory mitigating factor; the jury thus was free to conclude that the factor was present but reject the contention that it had mitigating value. *See* S.J.A. 747. The jury may well have credited Dr. Noble's testimony but simply refused to find the facts he alleged mitigating in light of the horrendous nature of the crime. The fact that some jurors *did* find several mitigating factors supported by Dr. Noble's testimony tends to indicate that those jurors *did* credit Dr. Noble's testimony, at least in part.[8]

Even if the jurors did not credit Dr. Noble's testimony, there is no reasonable probability that they would have credited his testimony if he had been more extensively prepared by counsel. During both direct and cross examination, Dr. Noble gave substantial reason for the jury to doubt his testimony. First, he admitted that much of the evidence on which he relied was of questionable veracity; he conceded that, as a result of the physical abuse he suffered, Moody "certainly learned to lie and manipulate in certain situations" and that he "was not able to verify" Moody's representations regarding his father's death in a car accident. S.J.A. 338, 394.

Moreover, the prosecution, through cross-examination, posed numerous questions that potentially discredited Dr. Noble, very few of which had any connection to Dr. Noble's challenged outline or the completeness of his investigation. The prosecution discredited Dr. Noble on the grounds that he had limited qualifications, S.J.A. 374, that he had limited knowledge of the available facts because he was not present for the preceding portion of the sentencing hearing, S.J.A. 375, 388, that he had only ever testified in favor of the defense in capital cases, S.J.A. 378–79, and that he had "often testified that there are mitigating factors that might be considered." S.J.A. 379. Even if Moody's counsel had directed Dr. Noble to remove all information from his outline that was of questionable veracity, or sought a continuance to verify the truth of all representations made by Dr. Noble, all of these grounds for discrediting Dr. Noble would still have been present.

There is thus no reasonable probability that the jury would have attributed any additional value to the mitigating circumstances supported by Dr. Noble's testimony, had no gaps or uncertainties existed in that testimony.

Finally, Moody argues that, had his trial counsel presented more evidence concerning his family history—primarily his abuse as a child—the jury would have assigned more mitigating weight to that history.

---

7. Specifically, Moody alleges that Dr. Noble's testimony supported the following mitigating factors rejected by the jury: Moody was classified as educable mentally retarded; he allowed other people to influence his behavior; he has an I.Q. of 81, which is of below average intelligence; and he functions at a less than second grade level in his ability to read and write. Brief of Appellant at 45–46; J.A. 73.

8. At least one juror concluded that the murder "was committed while the defendant was under the influence of mental or emotional disturbance"; that the defendant "acted under the domination of another person"; that "Moody was physically and verbally abused by his father during his formative years"; and that "Moody suffered during his childhood and adolescent years as a result of the lack of love and nurturing from his father and stepmother." J.A. 817–18.

The evidence of childhood abuse that Moody alleges should have been added is largely cumulative of what appeared in the record. Dr. Noble testified extensively of Moody's childhood abuse. S.J.A. 331–33, 336, 373. As part of his testimony, Dr. Noble noted confirmation of Moody's accusations from other sources. S.J.A. 332 (noting that Moody complained to his school at the time the abuse allegedly took place); S.J.A. 336 (noting that Steve, Moody's "half brother or step brother," alleged that Steve was brutally abused and described Moody as "his father's scapegoat"); S.J.A. 331 (noting that a neighbor in Ohio complained to Social Services reporting that Moody "was bruised and that he had been locked in his room"). Carl Jacobs and Janice Moody also testified that Moody was abused by his father. S.J.A. 461–64; S.J.A. 476, 486–87. Although neither saw Moody regularly after he was five years old, Janice did see him from time to time, and testified that his father treated him very badly. S.J.A. 487.

The affidavits presented by Moody in support of his habeas petition provide confirmation for this testimony of abuse. *See* J.A. 120–70. However, prejudice does not exist simply because more corroborating evidence could have been presented. The jury was presented with substantial and uncontradicted evidence that Moody was abused by his father. Given that the prosecutor did not present any evidence to contradict the evidence of abuse, there is simply no reasonable probability that the jurors doubted the existence of abuse and would have come to a different verdict had they been presented further evidence that abuse in fact occurred.

To the extent that the affidavits presented to the habeas court provide new evidence, they are, like Sheilagh's letter, double-edged. The affidavits would have informed the jury that Moody often had problems making friends as a child, which could possibly be mitigating. However, the affidavit of Moody's father also provided evidence that abuse did *not* occur, denying that he was ever "neglectful or abusive" to Moody. J.A. 121. Vince Shillig, who was the assistant principal of Moody's high school, stated that Moody "had a violent temper" and that Shillig "remember[ed] Patrick very well and fondly even though he was frequently in my office for violations of school rules, including two incidents when he brought a dangerous weapon to school." J.A. 166. Because the affidavits confirm that Moody has a history of violence and could have undermined the mitigating evidence of child abuse, they would have been as likely to harm Moody as to help him.

Because the additional evidence Moody alleges his counsel should have presented would have been unlikely to weaken the case in aggravation or strengthen the case in mitigation, there is no reasonable probability that the jury would have weighed aggravating and mitigating factors differently when presented with that additional evidence. Faced with Moody's guilty plea, his earlier conviction for attempted murder, and the cold-blooded manner in which he murdered Robbins, we are confident that the jury would not have returned a different verdict even if counsel had performed exactly how Moody now argues they should have. Moody is thus not entitled to relief.

## CONCLUSION

The judgment of the district court is affirmed.

*AFFIRMED.*

TRAXLER, Circuit Judge, concurring in the judgment:

I do not agree that the performance of Moody's trial counsel met the requisite

objective standard of reasonableness, and I am satisfied that the state court's contrary conclusion was based upon an unreasonable application of Supreme Court precedents. Accordingly, I cannot concur in the majority opinion. However, because I cannot say that, but for the deficient performance of counsel, there is a reasonable probability that the result of the sentencing proceeding would have been different, I concur in the judgment of the majority.

### I.

On September 16, 1994, Moody shot Donnie Robbins in the back of the head as Robbins leaned over the hood of an automobile. The next morning, Moody confessed to the murder and directed police to the murder weapon. Four days later, Moody provided officers with a second, more detailed confession, in which he admitted to officers that he had been having an affair with Donnie's wife Wanda and that Wanda asked him to murder Donnie so that she could collect proceeds from Donnie's life insurance.

Lead counsel Charles Harp was appointed to represent Moody on January 30, 1995, and Jon Myers was appointed as co-counsel on February 13, 1995. Harp met with Moody for the first time on March 29, 1995. On state post-conviction review, Harp stated that he was aware from the outset that his client "had provided detailed statements confessing to the crime" and "that unless th [e] statements were suppressed, there was a substantial likelihood Mr. Moody would be convicted of first degree murder." J.A. 275. However, Harp admitted that he "did not make any effort to pursue an independent investigation into Mr. Moody's family members or background" and "did not at any time prior to trial meet with [Moody] to explain to him the importance of his family as poten-

tial witnesses during the sentencing phase of his case." *Id.*

Attorney Myers met with Moody for the first time on June 14, 1995. Moody told Myers "that he preferred that [his family] not know or be involved in his trial," J.A. 282, a preference that Myers appears to have honored without further inquiry or protest. Like Harp, Myers also "did not explain to [Moody] in any detail the importance of his family as potential witnesses at that time." J.A. 283.

On July 4, 1995, nine days before the trial, Myers met with Moody for the second time. Moody told Myers that his father and stepmother had been killed in a violent car accident, but did provide information sufficient for Myers to contact a half-brother, Fred Mayle, who resided in Florida. Myers also noted the existence of two step-brothers and a step-sister who Moody apparently told him "would turn [their] own parents in." J.A. 290. Myers acknowledged that "Moody provided [him] with information to contact his half-brother, Fred Mayle," during this second interview, but that he "did not make any effort to pursue an independent investigation into Mr. Moody's family members and his childhood until July 15, 1995." J.A. 283.

Harp and Myers met with Moody a final time on Sunday, July 9, 1995, the day before the trial was set to begin. Over the course of the next five days, the state presented the testimony of seven witnesses. Moody's confessions were accepted into evidence. On Friday, July 14, Moody withdrew his plea of not guilty and entered a plea of guilty to murder in the first degree. The sentencing phase was set to begin on Monday, July 17. Only then did trial counsel begin their "independent investigation into Mr. Moody's family members and his childhood." J.A. 283. On Saturday, July 15, Myers contacted Mayle and learned that Moody's father

was alive and that numerous other family members lived in the Ohio area. However, Myers still waited until the following day to make any attempt to contact these other family members. Unsurprisingly, Myers stated that:

> [b]ecause of the short time frame, I was only able to secure his mother and one half-brother to testify a[t] the sentencing hearing beginning the next day. I was not able to contact many family members to testify or obtain other information because the sentencing phase was beginning the next day.

J.A. 283. The mother and half-brother, however, were ultimately of limited benefit to Moody. Moody's mother lost custody of Moody when he was approximately five years old and only saw him on a handful of occasions over the next twelve years. The half-brother did not see him at all during this time period.

In 1998, Moody sought post-conviction relief before the state MAR court, asserting *inter alia,* that trial counsel unreasonably failed to investigate mitigating evidence of his family background and social history and that, had Moody's jury been provided with the additional testimony that his post-conviction counsel uncovered, there was a reasonable probability that at least one juror would have refused to impose the death sentence. Within a matter of days, Moody's post-conviction counsel had secured twenty affidavits from family members and school personnel who had frequent contact with Moody during the years *after* he was removed from his mother's custody and *before* he left his father's home, *i.e.* from approximately age five to age seventeen. These witnesses attested, in graphic detail, to the constant physical and psychological abuse that was inflicted by Moody's father and stepmother at home and by his schoolmates during his junior-high and high school years, as well as to

their willingness to testify had they been contacted by trial counsel.

The state MAR court acknowledged that "there was in existence considerable information about [Moody] that might have been uncovered by a more thorough investigative effort," J.A. 104, and that "trial counsel could have done a better job of gathering and presenting evidence in mitigation (e.g., by making earlier contact with a number of [Moody's] family members in Ohio)," J.A. 89–90. However, the court found that counsel's investigation into Moody's family history and social background was not deficient, in large part because Moody had "withheld information from his trial counsel about his family members and expressed a desire not to have his family members either advised about his trial or involved in his trial," when Myers interviewed him on June 14, and had "not provide[d] truthful information regarding his family" in that he "falsely report[ed] that his father had been killed in a car accident" when Myers interviewed him on July 4. J.A. 97–98.

## II.

In order to establish ineffective assistance of counsel, Moody was required to demonstrate (1) that his "counsel's representation fell below an objective standard of reasonableness," measured by the "prevailing professional norms," *Strickland v. Washington,* 466 U.S. 668, 688, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), and (2) "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," *id.* at 694, 104 S.Ct. 2052. "Unless a defendant makes both showings, it cannot·be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable." *Id.* at 687, 104 S.Ct. 2052.

Because Moody's Sixth Amendment claim was adjudicated on the merits by the North Carolina state court, we are precluded from granting habeas relief unless the state court's adjudication of the claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C.A. § 2254(d) (West Supp.2004); *see also Williams v. Taylor,* 529 U.S. 362, 412–13, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000).

### A.

I begin with Moody's claim that his counsel's representation fell below an objective standard of reasonableness, measured by the prevailing professional norms, because they failed to investigate adequately his family history and social background.

It is well-established that, in death penalty cases, "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Strickland,* 466 U.S. at 691, 104 S.Ct. 2052. "[I]n deciding whether [counsel] exercised reasonable professional judgment," we "focus on whether the investigation supporting counsel's decision not to introduce mitigating evidence of [defendant's] background *was itself reasonable." Wiggins v. Smith,* 539 U.S. 510, 522–23, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003) (internal alteration and quotation marks omitted). A decision not to investigate is "reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Strickland,* 466 U.S. at 691, 104 S.Ct. 2052.

In *Strickland,* the Supreme Court also held that "[t]he reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions." *Id.* Specifically, the Court recognized that:

> [c]ounsel's actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant. In particular, what investigation decisions are reasonable depends critically on such information.... [W]hen a defendant has given counsel reason to believe that pursuing certain investigations would be fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable. In short, inquiry into counsel's conversations with the defendant may be critical to a proper assessment of counsel's investigation decisions, just as it may be critical to a proper assessment of counsel's other litigation decisions.

*Id.*

In *Wiggins,* the Court expounded on the obligations of counsel in the context of investigating a capital defendant's background. There, counsel's pretrial investigation uncovered evidence of Wiggins' foster-care background and general misery as a youth, but counsel failed to expand the investigation and did not ultimately present any such evidence in mitigation. The Court held that this was deficient performance because "counsel abandoned their investigation of petitioner's background after having acquired only rudimentary knowledge of his history from a narrow set of

sources." *Wiggins,* 539 U.S. at 524, 123 S.Ct. 2527. Also, the court noted that: counsel uncovered no evidence in their investigation to suggest that a mitigation case, in its own right, would have been counterproductive, or that further investigation would have been fruitless; this case is therefore distinguishable from our precedents in which we have found limited investigations into mitigating evidence to be reasonable. *See e.g., Strickland,* 466 U.S. at 699, 104 S.Ct. 2052 (concluding that counsel could "reasonably surmise . . . that character and psychological evidence would be of little help"); *Burger v. Kemp,* 483 U.S. 776, 794, 107 S.Ct. 3114, 97 L.Ed.2d 638 (1987) (concluding counsel's limited investigation was reasonable because he interviewed all witnesses brought to his attention, discovering little that was helpful and much that was harmful); *Darden v. Wainwright,* 477 U.S. 168, 186, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986) (concluding that counsel engaged in extensive preparation and that the decision to present a mitigation case would have resulted in the jury hearing evidence that petitioner had been convicted of violent crimes and spent much of his life in jail).

*Id.* at 525, 123 S.Ct. 2527.

In this case, I have no difficulty concluding that trial counsel's limited investigation into mitigating evidence of Moody's childhood was unreasonable and that the conclusion of the state MAR court to the contrary was an unreasonable application of these governing precedents.

Trial counsel was admittedly aware, from the outset, that his client "had provided detailed statements confessing to the crime" and "that unless th[e] statements were suppressed, there was a substantial likelihood Mr. Moody would be convicted of first degree murder." J.A. 275. Yet,

despite this recognition, trial counsel never explained to Moody the significance of family and social history as mitigating evidence and accepted without further inquiry Moody's request that his family not be notified of the capital trial. Counsel also failed to contact the single family member identified by Moody or to conduct any other independent investigation until after the guilt phase had concluded—a mere two days before the sentencing proceeding began.

Obviously, it cannot be said that trial counsel made a strategic choice not to investigate or present background information after "fulfill[ing] their obligation to conduct a thorough investigation of the defendant's background." *Williams,* 529 U.S. at 396, 120 S.Ct. 1495. On the contrary, counsel had planned to advance Moody's abusive and traumatic childhood as mitigating in nature, but did not get around to contacting any of Moody's family members who might be able to corroborate that abuse until the eve of the sentencing hearing. And even though Moody told his counsel "that he preferred that [his family] not know or be involved in his trial," J.A. 282, it cannot be said that Moody made an "informed strategic choice[ ]" regarding such an investigation, *Strickland,* 466 U.S. at 691, 104 S.Ct. 2052. Moody's trial counsel admitted that they failed to explain the significance of such an investigation to him at the time. For the same reason, counsel cannot justify their eleventh-hour investigation as a reasonable decision not to investigate based upon "information supplied by the defendant," *id.,* nor can it be said that they "reasonably surmise[d] from [their] conversations with" Moody that further investigation "would be of little help," *id.* at 699, 104 S.Ct. 2052. There is absolutely no indication that Moody gave counsel reason to believe that pursuing an investigation into

his family history and social background would be fruitless or harmful to the case in mitigation.

In this case, counsel failed to fulfill their obligation to explain to their client the capital process and the importance of mitigating evidence in a penalty phase *and* failed to fulfill their obligation to conduct a reasonably thorough investigation of Moody's background. The critical nature of the former obligation simply cannot be divorced from the latter. For these reasons, I cannot endorse the state court's view that counsel's investigation into Moody's childhood was not deficient under *Strickland* and its progeny because Moody had not been forthcoming about his family members, expressed a desire they not be advised about or involved in the trial, and falsely reported that his father and stepmother were deceased.

In sum, I would hold that the state court's determination that counsel's performance was not deficient was an unreasonable one, and conclude *de novo* that counsel's investigation into mitigating evidence was plainly deficient. By waiting until the last minute to conduct even the most cursory investigation, Moody lost the benefit of readily-available witnesses who could have offered independent, eyewitness accounts of the physical and mental abuse Moody sustained from the age of five until the age of seventeen. From the outset of the case, counsel knew that the only hope of avoiding a conviction was to successfully exclude Moody's confessions and "had every reason to develop the most powerful mitigation case possible." *Wiggins*, 539 U.S. at 526, 123 S.Ct. 2527. Thus, it is apparent that counsel's "failure to investigate thoroughly resulted from inattention, not reasoned strategic judgment." *Id.* Trial counsel's investigation into Moody's childhood abuse, and the resulting failure to present Moody's family

members, schoolmates, and school officials who knew him during these years, was constitutionally deficient, and I am of the view that the state court's decision to the contrary is an unreasonable application of Supreme Court precedent.

### B.

My conclusion that counsel's representation fell below an objective standard of reasonableness, however, is alone insufficient to support a grant of habeas relief to Moody. Moody was also required to demonstrate that his counsel's performance prejudiced him; specifically, "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694, 104 S.Ct. 2052. "When a defendant challenges a death sentence ..., the question is whether there is a reasonable probability that, absent the errors, the sentencer ... would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Id.* at 695, 104 S.Ct. 2052.

In my view, the question of whether counsel's errors prejudiced Moody is a close one. However, because trial counsel presented some evidence of Moody's traumatic and abusive childhood (albeit from less than ideal sources), and at least some of the jurors found mitigating circumstances based upon this evidence, I concur in the judgment affirming the denial of habeas relief.

As noted above, due to the eleventh-hour investigation conducted by trial counsel, the only family members to testify were Moody's mother, Janice Moody, and his half-brother, Carl Jacobs. According to the summary adopted by the state MAR court,

> Carl Jacobs testified that he moved into his mother's household for a few months when he was about 15 and lived there

with six other children and Patrick's father, Dick Moody. *According to Carl, Patrick was a pre-schooler at that time.* He remembered Dick Moody disciplining Patrick by hitting him hard with a thick board. Carl also testified that he saw Dick Moody attempt to break plates on Defendant's head and that Patrick would scream and cry. Patrick would be locked in his room without food for periods lasting up to 18 hours. Asked why his stepfather punished Patrick, Carl testified: "If he didn't do—if Pat didn't do what Dick wanted, it could be any reason whatsoever. He really didn't need a reason to do what he did.... ·If he was in a bad mood, that's all it took."

Janice Moody, the defendant's mother, testified that Dick Moody's abuse led to her filing for divorce when Patrick was very young: "I asked him to leave my house because he was getting very violent at all times and at the time he told me he didn't have to leave and he kept getting more abusive and acted real bad to all the kids and I was afraid he would hurt them. So I got a court order to get him out of my house." Mrs. Moody testified that she thought that Dick Moody abused Patrick in order to hurt her: "He would take Pat's food from him and send him to his room. He might not be mad at Pat. He punished Pat because that hurt me...." She explained that she and Patrick were both afraid of Dick Moody: "I was afraid for my son because he was only two and I was afraid he might kill him because he being in such a rage and mad at me or something and he would take it out on Patrick."

S.J.A. 808–09 (internal citations ·omitted) (alteration in original).

Because Carl Jacobs and Janice Moody had little or no contact with Moody from the time that he was four or five years old until he was seventeen years old, their testimony was of limited benefit. However, Moody himself did offer testimony, largely unrefuted, about his experiences in his father's home after the age of five. He confirmed that he was placed by the courts with his father, stepmother, and half-siblings at a very young age, and that he rarely saw his mother thereafter. Moody testified that he was not given appropriate clothes, that he was sometimes forced to go three of four days without food, and that he was often locked in a room. He testified that his father hit him constantly, and threw him through a plate glass window on one occasion. He also testified that his father shot him with BB guns, threatened to kill him, shot him in the leg with a bow and arrow, and constantly beat him. He testified that his step-mother also beat him and deprived him of food, and that he was shunned by his step-brothers and step-sisters.

The jury also heard evidence of Moody's childhood circumstances during this period via the testimony of Dr. Jerry Noble, who interviewed and evaluated Moody for purposes of presenting mitigating evidence. Dr. Noble "diagnosed [Moody] as suffering from an attention deficit hyperactivity disorder, alcohol dependence, a mixed personality disorder, child abuse syndrome, and psychologically caused physical problems," and "testified that [Moody] had borderline intellectual functioning with a full scale IQ of 81." *State v. Moody*, 345 N.C. 563, 481 S.E.2d 629, ·632 (1997). Dr. Noble also gleaned corroborating information of childhood abuse from his review of school and mental health reports. He was able to relate to the jury that Moody reported abuse to school officials during these years, and that a neighbor contacted Social Services to report that Moody was bruised and had been locked in his room for a long interval of time. In addition, Dr. Noble testified that Moody's "half-brother Steve

confirmed [Moody's] abuse by [his] father to [a] therapist at the mental health center." S.J.A. 335. Dr. Noble testified that, according to the report:

> Steve is said to have reported his own abuse by [Moody's] father between ages 7 and 11, including comments that he was often beaten with boards and also that Steven is said to have described Patrick's father as brutal. The therapist's notes included information that Mr. Moody's father kicked out the children from the home by the time that they were around 16 years of age, at least several of the children. The therapist noted that Mr. Moody's brother ... described Patrick as his father's scapegoat. On the other hand, that Mr. Moody's stepmother did not want him, had never wanted him, had taken little responsibility for him and showed little attention to Mr. Moody. That Mr. Moody had been raised under many restrictions with very few privileges. That Mr. Moody was hyperactive and that he had poor social skills, especially with women.

S.J.A. 336.

Against this mitigating evidence, the state presented evidence, largely uncontradicted by Moody, that Moody began an affair with the victim's wife in July 1994 and, over the course of several weeks in September, conspired with her to kill Donnie and share the life insurance proceeds as a result of that relationship. They discussed numerous plans, including Moody's suggestion that Donnie could be poisoned with mercury and at least one attempt to hire a hit man who failed to show up. The owner and two residents of the trailer park where Donnie and Wanda lived "testified that Donnie and Wanda argued often and that on at least two occasions these residents had identified mercury in the beer that Donnie was drinking." *Moody*, 481

S.E.2d at 632. There was also evidence of a plan for Moody to kill Donnie with a machete that Wanda and Moody had purchased at a nearby store, but Moody fled the area where they had planned the attack when he heard someone shouting nearby. The final plan was carried out. Moody lured the victim to a secluded area under the pretense of buying a used automobile, and shot him in the back of the head "execution-style" with a .32–caliber semiautomatic pistol. Donnie's life insurance agent testified that Wanda "called her at 5:30 a.m. the morning after the murder to complete the paperwork necessary for Wanda's claim for the insurance benefits payable upon Donnie's death." *Id.*

In addition to the compelling evidence of the extensive planning by Moody and Wanda to murder Donnie for pecuniary gain, the jury heard devastating evidence of Moody's prior criminal record. Moody had been convicted in Florida of felony burglary, grand theft, carrying a concealed weapon, attempted first-degree murder and conspiracy to commit first-degree murder. The attempted murder and conspiracy to commit murder arose from Moody's entry into the home of a woman whom he had been hired to kill for $2,500.

At the conclusion of the sentencing phase of the trial, the jury unanimously found the existence of the only two aggravating circumstances submitted to it for consideration: (1) that Moody had been previously convicted of a felony involving the use of violence; and (2) that the murder was committed for pecuniary gain. The trial judge submitted twenty-one mitigating circumstances to the jury for consideration. Twelve jurors found that Moody aided in the apprehension of another capital felon; four jurors found that the murder was committed while Moody was under the influence of mental or emotional

disturbance; one juror found that Moody acted under the domination of another person; two jurors found that Moody was physically and verbally abused by his father during his formative years; and one juror found that Moody suffered during his childhood and adolescent years as a result of the lack of love and nurturing from his father and step-mother. No juror found any of the remaining fifteen mitigating circumstances. Death was recommended.

Viewing the totality of the evidence before the jury and the mitigating circumstances which were submitted and found, I cannot conclude that there is a reasonable probability that, had trial counsel presented the potential mitigation evidence developed during habeas along with the mitigation evidence presented, that the jury would have returned a life sentence. Accordingly, while I believe the state court's determination that counsel's investigation was not deficient was an unreasonable one, I concur in the judgment denying habeas relief because I ultimately cannot say that counsel's deficient performance prejudiced Moody.