PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

NATHAN WAYNE BOWIE,
          *Petitioner-Appellant,*

v.

GERALD J. BRANKER, Warden,
Central Prison, Raleigh, North
Carolina,

          *Respondent-Appellee.*

No. 06-25

Appeal from the United States District Court
for the Western District of North Carolina, at Statesville.
Frank D. Whitney, District Judge.
(5:03-cv-00137)

Argued: October 31, 2007

Decided: January 3, 2008

Before MICHAEL, KING, and DUNCAN, Circuit Judges.

Affirmed by published opinion. Judge Duncan wrote the opinion, in which Judge Michael and Judge King concurred.

## COUNSEL

**ARGUED:** Mark Alexander Charns, CHARNS & CHARNS, Durham, North Carolina; Steven Robert Edelstein, EDELSTEIN & PAYNE, Raleigh, North Carolina, for Appellant. Jill Ledford Cheek, Special Deputy Attorney General, NORTH CAROLINA DEPARTMENT OF JUSTICE, Raleigh, North Carolina, for Appellee. **ON**

**BRIEF:** Roy Cooper, Attorney General, Raleigh, North Carolina, for Appellee.

---

## OPINION

DUNCAN, Circuit Judge:

Nathan Wayne Bowie petitions this court for review of the district court's denial of his petition under 28 U.S.C. § 2254 for relief from the sentences of death he received in connection with two North Carolina first-degree murder convictions. For the reasons that follow, we affirm.

### I.

### A.

The unchallenged facts adduced at trial and found by the state court follow. On May 23, 1991, at around 11:00 p.m., the uncle, William Barfield Bowie ("William"), and aunt, Rochelle Bowie ("Rochelle"), of Nathan Wayne Bowie ("Bowie") approached Nelson Shuford ("Shuford") and Calvin Wilson ("Wilson") in the street. An argument ensued between Rochelle and Shuford. Seeing acquaintances of Shuford's gathering, William and Rochelle walked away from the argument. They then heard shots fired from behind them. Rochelle believed that Shuford and Wilson were shooting at her, but in fact Wilson was shooting into the air.

William and Rochelle returned to Rochelle's residence, where William attempted to contact Bowie. Reaching Bowie's mother by telephone, William left a message for Bowie, explaining what had transpired and asking Bowie to meet him at Rochelle's residence as soon as possible. Shortly thereafter, Bowie, then twenty-years old, arrived, carrying a .45 firearm. Bowie explained, "I had a funny feeling something was going to go down so I brought the gun." J.A. 579. William then retrieved a .25 firearm and checked it for bullets. Bowie was overheard telling William, "I know where he live[s]. He live[s]

in Newton." *Id.* (alteration in original). Shuford in fact resided in Newton.

Early the next morning, Bowie and William left Rochelle's house. Around 8:00 a.m., Bowie was seen pounding on the front door of Shuford's residence in Newton, calling for Shuford to come out, claiming to be "Neal" from Charlotte. Finding Shuford not at home, Bowie left, angry and cursing, and sped away in his truck. Three witnesses, including two who knew Bowie from high school, identified Bowie as the man banging on Shuford's door.

Approximately two hours later, Shuford and Wilson were standing and socializing with four friends in the yard of Phillip Link. According to multiple eyewitnesses, Bowie and William appeared from behind a building and approached the group. Shuford asked, "[W]hat's up, man[?]", J.A. 580, then Bowie and William began firing, killing Shuford and Wilson.

Later forensics revealed that Shuford had been shot once in the chest by a large-caliber bullet, dying instantly. Wilson was shot in the chest with a small-caliber bullet and in the head with a large-caliber bullet. One of the gunshot wounds was delivered after Wilson was already on the ground suffering from the other. Wilson died several days later from the head wound. Neither victim was armed at the time of the shootings, though Wilson's gun was some distance away in the trunk of his car.

Immediately after the killings, Bowie and William fled to Philadelphia, where they were soon apprehended and charged with the murders. Bowie and William were tried together, each for two counts of first-degree murder, in the Catawba County Superior Court in North Carolina. Bowie was represented at trial by two court-appointed attorneys: W. Thomas Portwood, Jr. ("Portwood") and Mark Killian ("Killian"). Portwood had a general practice that included court-appointed criminal work. He had previously represented several capital defendants. It was later revealed that Portwood struggled with alcohol dependence during his representation of Bowie.[1] Killian was

---

[1]Portwood later insisted, however, that he was never intoxicated while actually performing work on Bowie's case.

a young attorney from a firm that engaged primarily in civil matters and had no capital experience. Before trial, the two attorneys negotiated a plea offer for Bowie in which Bowie would have pleaded guilty to two counts of second-degree murder, for which he would have received life imprisonment but been spared a potential death sentence. Bowie declined the proffered plea agreement, electing instead to go to trial.

A number of witnesses testified at trial as to the essential facts surrounding the killings. For example, disinterested eyewitnesses testified to Bowie and William's discussion and handling of firearms the night before the killings, to Bowie's pounding on Shuford's door, and to the killings themselves. In addition to the undisputed testimony of those witnesses, the government read into evidence two statements that are at issue in this appeal.

The government introduced a voluntary statement that co-defendant William had given to police shortly after his arrest. In the statement, William explained that either Shuford or Wilson took jewelry from Rochelle's house, which prompted the argument in the street the night before the murders. The next day, William continued, he met up with "someone" at Rochelle's house.[2] J.A. 33. The two left together in search of Shuford and Wilson, whom they found in Link's yard. William and Shuford started arguing. William stated that he heard a shot issue from behind him and saw Shuford fall to the ground. William explained that he panicked, pulled out his own firearm and fired two rounds in the direction of Shuford and Wilson before the gun jammed. He heard another shot, then began to run, hearing one final shot behind him as he escaped the scene. William insisted to police that he had brought his gun with him that morning only as a precaution, knowing that at least one of the men had been armed the night before, and that he did not intend to kill anyone. Bowie's counsel made no objection to the admission of the statement, nor did they ask that a limiting instruction be provided to ensure the jury did not consider the statement to implicate Bowie.

---

[2]The statement had been sanitized so as not to expressly identify Bowie, referring instead to "someone" or "we."

The government also introduced a statement that Rochelle had provided to investigators on the night of the murders. Bowie objected to admission of the statement on the ground, inter alia, that it would violate his rights under the Confrontation Clause of the Sixth Amendment.[3] The trial court overruled the objection and allowed the statement to be admitted under Rule 804 of the North Carolina Rules of Evidence, governing admission of statements made by unavailable witnesses.

Rochelle explained in her statement that she had argued with Shuford regarding the location of her missing jewelry. She confirmed the testimony of other witnesses that Bowie and William handled firearms that night at her house. She also stated that the duo drove off the next morning in Bowie's truck, returning a few hours later in haste to take Rochelle and her children to stay with a relative. En route, either Bowie or William told her, "[W]e got them." J.A. 30. Bowie and William told her they were going to Philadelphia.

In the face of the essentially undisputed testimony at trial that Bowie and William shot Shuford and Wilson, Bowie's counsel focused their closing statements on the government's supposed failure to prove premeditation, asking the jury to return verdicts for second-degree murder. The jury nevertheless found Bowie and William guilty of both counts of first-degree murder under the theory of acting in concert.

## B.

At sentencing, Killian took the lead in representing Bowie. He presented the testimony of six witnesses: Bowie's mother, Joan Hunt; his former social worker from the Catawba County Department of Social Services ("DSS"), Joanne Sigmon; two of his high school football coaches; his high school principal; and his eighth-grade teacher. Joan Hunt testified that during Bowie's childhood she was a single parent with no permanent address, staying where she could for the first several years of his life. She explained that Bowie had been sexually abused as a child by her mother's boyfriend. She admitted that

---

[3]Rochelle had moved to Philadelphia after the murders. Law enforcement attempted to locate her there, but friends and family indicated that she had moved again and had not provided her new address.

she abused heroin, cocaine and other drugs during that time, on occasion using Bowie to consummate transactions with a local dealer on her behalf. She testified that she sought treatment for her drug addictions more than once, with Bowie ultimately moving to the Sipes Orchard Home ("Sipes"), an orphanage, so she could devote herself to treatment. She explained that Bowie's biological father was absent for much of his childhood serving a jail sentence for a "gang war murder." J.A. 97.

Joanne Sigmon testified that she had supervised Bowie's foster care from age twelve to age nineteen, one year prior to the murders. She explained that Bowie was generally well-liked, and that she developed a close relationship with him over his years in the foster system. For example, she and her family hosted a high-school graduation party for him, and she made a personal loan to him to help him buy a truck. The other witnesses also testified positively about Bowie's character, commenting on his popularity in school, his modest academic success, and his willingness to learn from his mistakes on the football field.

Three statutory aggravating factors were submitted to the jury, which found two to exist: that each murder "was committed while the defendant was engaged . . . in the commission of . . . any [other] homicide," N.C. Gen. Stat. § 15A-2000(e)(5); and that each murder "was part of a course of conduct in which the defendant engaged and which included the commission by the defendant of other crimes of violence against another person or persons," *id.* § 15A-2000(e)(11).[4] The jury was also asked to consider fifteen mitigating factors. It found the statutory mitigating factor that Bowie "ha[d] no significant history of prior criminal activity," *id.* § 15A-2000(f)(1). The jury also found nine non-statutory mitigating factors, focusing primarily on the hardships Bowie suffered throughout his childhood, such as the paucity of reliable parental support available to him, and on his successes in high school. The jury rejected the proffered mitigating factors relating to Bowie's residency at Sipes, finding them not to have mitigating value. The jury recommended sentences of death for both first-degree mur-

---

[4]The jury did not find that the murder of Wilson "was committed for the purpose of avoiding or preventing a lawful arrest," *id.* § 15A-2000(e)(4).

der convictions, and the trial court entered judgment in accordance with those recommendations.[5]

Through the same counsel, Bowie exhausted his direct appeals. *State v. Bowie*, 456 S.E.2d 771 (N.C. 1995), *cert. denied*, 516 U.S. 994 (1995). He then filed a Motion for Appropriate Relief ("MAR") in the Superior Court for Catawba County (the "MAR court"). Bowie's MAR, as later amended, put forth, inter alia, three claims that counsel rendered ineffective assistance, in (1) failing to investigate certain aspects of Bowie's background, including his mental-health history, in preparation for sentencing; (2) failing to object to the admission of William's statement, or, alternatively, failing to request an instruction limiting its relevance to William's guilt; and (3) failing to appeal the admission of Rochelle's statement as violative of the Confrontation Clause of the Sixth Amendment. The MAR court denied all three claims. Bowie's petitions for writ of certiorari in the North Carolina Supreme Court, *State v. Bowie*, 572 S.E.2d 789 (N.C. 2002), and in the United States Supreme Court, *Bowie v. North Carolina*, 539 U.S. 961 (2003), were both denied.

Bowie then turned to the federal courts for relief, filing a 28 U.S.C. § 2254 petition for a writ of habeas corpus in the United States District Court for the Western District of North Carolina. The district court found that counsel had been deficient in failing to investigate Bowie's background properly before selecting their sentencing strategy, and that the MAR court had erred in finding otherwise.[6] The district court found that such failure did not prejudice Bowie, however,

---

[5]William also received two sentences of death for his convictions, which were affirmed on appeal. *See State v. Bowie*, 456 S.E.2d 771, 778 (N.C. 1995).

[6]The district court noted, for example, that counsel could not have made a reasonable decision to forgo mental-health testimony at sentencing when they had not first conducted an investigation into Bowie's background. The district court concluded that "an attorney's decision not to conduct a mitigation investigation because he might find out something that ruins his rosy image of his client does not constitute a 'reasonable decision'" under clearly established Federal law. *Bowie v. Polk*, No. 5:03-CV-137-MU, 2006 WL 2846980, at *21 (W.D.N.C. Sept. 29, 2006).

and, finding no other MAR court error, denied the petition. Bowie was ultimately granted a certificate of appealability as to all three issues.

## II.

We review de novo the district court's denial of Bowie's petition for a writ of habeas corpus, applying the same standards as did the district court. *Robinson v. Polk*, 438 F.3d 350, 354 (4th Cir. 2006). The Anti-Terrorism and Effective Death Penalty Act ("AEDPA"), 28 U.S.C. § 2254, governs our consideration of Bowie's challenges to his sentence.

For claims adjudicated on the merits in state court, a writ of habeas corpus should be granted under AEDPA if such adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." § 2254(d)(1). "A decision is 'contrary to' clearly established federal law if it either applies a legal rule that contradicts prior Supreme Court holdings or reaches a conclusion different from that of the Supreme Court 'on a set of materially indistinguishable facts.'" *Buckner v. Polk*, 453 F.3d 195, 198 (4th Cir. 2006) (quoting *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000)). A decision is an unreasonable application of clearly established federal law if it "'unreasonably applies' a Supreme Court precedent to the facts of the petitioner's claim." *Id.* (quoting *Williams*, 529 U.S. at 413).

## III.

All three of Bowie's claims focus on the allegedly ineffective assistance of counsel he received at sentencing or on direct appeal. Claims that counsel provided ineffective assistance are governed by the familiar two-pronged test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). To succeed on a claim of ineffective assistance of counsel, a petitioner must show both that (1) counsel's performance was deficient; and (2) the deficient performance prejudiced the defense. *Id.* at 687. In light of the deferential standard of review under AEDPA, we are limited to determining whether, for each ineffective

assistance claim, the MAR court reached a decision contrary to, or unreasonably applied, Supreme Court precedent.

We now analyze each of Bowie's ineffective assistance of counsel claims.

### A.

Bowie's primary argument is that his counsel rendered constitutionally ineffective assistance by failing to investigate and present at sentencing mitigating evidence contained in the records of his stay at Sipes, in his county mental-health records, and in the records of his involvement with DSS; and additional mitigating evidence available from witnesses with personal knowledge of Bowie's character or the events surrounding the murders. Had counsel performed such investigation, Bowie surmises, they would have submitted three additional statutory mitigating factors to the jury for consideration. *See* N.C. Gen. Stat. § 15A-2000(f)(2) ("The capital felony was committed while the defendant was under the influence of mental or emotional disturbance."), (f)(6) ("The capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was impaired."), and (f)(7) ("The age of the defendant at the time of the crime.").[7] He asserts that, had the additional evidence been introduced at trial and the mitigating factors submitted to the jury, there is a reasonable probability that the jury would not have returned a death sentence, and therefore his counsel was constitutionally ineffective.

### 1.

Ordinarily, we would begin our analysis of Bowie's claim by examining the first prong of *Strickland*, finding counsel's performance to be deficient if it "fell below an objective standard of reason-

---

[7]Under North Carolina law, "chronological age is not the determinative factor with regard to th[e] mitigating circumstance" found in § 15A-2000(f)(2). *State v. Bowie*, 456 S.E.2d at 773 (citing *State v. Oliver*, 307 S.E.2d 304, 332 (N.C. 1983)). "The defendant's immaturity, youthfulness, or lack of emotional or intellectual development at the time of the crime must also be considered." *Id.*

ableness . . . under prevailing professional norms." 466 U.S. at 688.[8]
Here, however, the government did not challenge in any meaningful
way in its brief the district court's finding that counsel's performance
was deficient for purposes of the first prong of *Strickland*. We thus
turn directly to the second prong—whether counsel's deficient perfor-
mance prejudiced Bowie at sentencing.[9]

2.

Bowie initially presented the "failure to investigate" issue to the
MAR court. The MAR court scheduled a hearing to review the addi-
tional mitigating evidence that allegedly could have been presented
but for counsel's failure to investigate. At the hearing, Bowie again
elicited testimony from his mother, Joan Hunt, and social worker,
Joanne Sigmon, who had both already testified at trial. They testified
that Bowie began drinking heavily at an early age, showing signs of
a substance abuse problem in high school. Bowie's sister Mekia also
testified, corroborating the dire circumstances of Bowie's upbringing.
In addition, Bowie called a number of current and former Sipes
employees, who testified that Bowie was generally well-liked at
Sipes. They also testified as to an incident in which a Sipes employee
was terminated for sexually abusing a Sipes resident. No evidence
was presented to establish that Bowie himself was a victim of sexual
abuse at Sipes.

Bowie also called Dr. Nathan Strahl, a clinical and forensic psychi-
atrist, who opined that Bowie suffered from alcohol dependence, can-
nabis dependence, major depression, impulse-control disorder and

---

[8]In assessing counsel's performance against that standard, the court
must "indulge a strong presumption that counsel's conduct falls within
the wide range of reasonable professional assistance." *Strickland*, 46 U.S.
at 699. Nevertheless, counsel may not be viewed to have acted reason-
ably in making a strategic choice without first conducting "either a full
investigation of the law and facts or an abbreviated investigation of the
law and facts" limited by reasonable professional judgments that further
investigation would be fruitless. *Buckner*, 453 F.3d at 201.

[9]In any event, our conclusion with respect to the prejudice prong
would obviate the need to decide the deficiency issue. *See Buckner*, 453
F.3d at 202 & n.6.

anti-social personality disorder, among others, at the time of the murders. Dr. Strahl explained that individuals with such disorders can be "dangerous people," especially when drinking. J.A. 1619. The state introduced its own medical experts, however, who testified that, at the time of the murders, Bowie did not suffer from a mental or emotional disturbance, nor did he lack the capacity to appreciate the criminality of his conduct.

Additionally, Bowie's trial counsel were called to testify at the MAR hearing. Portwood explained that he had settled upon a sentencing strategy after his first meeting with Bowie—to present Bowie in a positive light, focusing on the popularity and accolades he achieved despite a rough upbringing, instead of presenting him as suffering from various mental-health problems and dependencies. Portwood based this strategy, he explained, on his previous capital experience; he had met with success in avoiding a death sentence for a prior client by presenting only positive character evidence. Portwood acknowledged, however, that he abused alcohol during the time he was representing Bowie, but he insisted that he was never intoxicated while actually performing work on Bowie's case.

Considering the proffered evidence, the MAR court found that counsel had not provided deficient assistance by pursuing its sentencing strategy of avoiding opening the door to negative evidence of Bowie's behavioral problems at Sipes, his mental health, and his substance abuse.[10] The MAR court also found that any error in counsel's failing to investigate did not prejudice Bowie in light of the other evidence before the jury at sentencing. The district court reviewed the MAR court's prejudice analysis and found it not unreasonable.

3.

Under AEDPA, the narrow question presented us on appeal is whether the MAR court reached a decision contrary to, or unreasonably applied, *Strickland* and its progeny in finding that Bowie had not

---

[10]As mentioned *supra*, this MAR finding regarding sentencing strategy and deficiency was found unreasonable by the district court. Because the government did not challenge the district court's conclusion on this question in its brief, we decline to discuss it further.

shown that he was prejudiced by his counsel's failure to investigate. Under this second prong of *Strickland*, the habeas petitioner bears the burden of affirmatively proving prejudice. *Strickland*, 466 U.S. at 693. "It is not enough for the [petitioner] to show that the [deficient performance] had some conceivable effect on the outcome of the proceeding." *Id.* Instead, the petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the [sentence] would have been different." *Id.* at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome" of the proceeding. *Id.* Under North Carolina law, a jury cannot recommend death over life imprisonment unless the members unanimously decide that "the mitigating . . . circumstances are insufficient to outweigh the aggravating . . . circumstances found." N.C. Gen. Stat. § 15A-2000(b), (c)(3). Therefore, the prejudice inquiry in this case distills to whether Bowie has shown that there is a reasonable probability that, but for counsel's deficient performance, at least one jury member would have found the mitigating circumstances to outweigh the aggravating circumstances and recommended life imprisonment. In making this determination, we must "re-weigh the evidence in aggravation against the totality of available mitigating evidence." *Wiggins v. Smith*, 539 U.S. 510, 534 (2003).

Bowie cannot meet his substantial burden of showing that the MAR court was unreasonable in finding a lack of prejudice. First, the additional evidence adduced at the MAR hearing does little to undermine the evidence supporting the aggravating factors found by the jury. Both aggravating factors found here spring from the fact that each murder occurred in conjunction with other violence, namely the other murder. *See* N.C. Gen. Stat. § 15A-2000(e)(5), (11). Bowie's history, however underprivileged, would not have impacted the jury's finding of these two aggravating factors. Beyond the statutory aggravating factors, the undisputed testimony as to the cold-blooded nature of the murders remained before the jury at sentencing. Without contest, the evidence showed that Bowie and William handled firearms the night before the murders and discussed where Shuford lived. The undisputed evidence showed that Bowie had banged on Shuford's door looking for him the next morning, then waited a couple of hours before confronting him in a friend's yard. The undisputed evidence showed that Bowie killed Shuford and Wilson without proximate

provocation. Therefore, in the "reweighing" required by *Wiggins*, we find the evidence in aggravation to remain substantial indeed.

On the other side of the balance, the mitigating evidence presented at Bowie's MAR hearing should be discounted, under our precedent, as double-edged, *see Moody v. Polk*, 408 F.3d 141, 152 (4th Cir. 2005), or duplicative, *see Buckner*, 453 F.3d at 207. For example, evidence of Bowie's alcoholism and the absence of parental oversight during his childhood could be viewed as either supporting or detracting from the mitigating circumstances of immaturity and youthfulness. *See* N.C. Gen. Stat. § 15A-2000(f)(7). Likewise, had counsel for Bowie introduced its mental-health expert at sentencing, the government could have introduced its own experts who, as they indicated at the MAR hearing, would have vigorously opposed the characterization of Bowie as suffering from mental illness. *See id.* § 15A-2000(f)(2), (6). We cannot say that, had such equivocal mental-health evidence been introduced, there is a reasonable probability that the jury would not have recommended death. *See Moody*, 408 F.3d at 151 (discounting certain MAR evidence because it "is a double-edged sword that might as easily have condemned [the petitioner] to death as excused his actions") (internal quotations omitted).

Finally, the mitigating evidence presented at the MAR hearing was substantially duplicative of evidence that *had* been presented to the jury. The additional evidence of Bowie's squalid upbringing would have added little to the self-effacing testimony his mother had already provided. Furthermore, additional witnesses who could testify to Bowie's good character would have presented overlapping testimony with that of the football coaches, school personnel, and social worker who already testified in detail as to Bowie's personality. Even the witnesses from Sipes would have presented testimony falling mostly into these same two categories of poor upbringing and good character. *See Buckner*, 453 F.3d at 207 (finding that duplicative evidence "would [not] have added measurably to [the petitioner's] mitigation case").

Weighing the aggravating circumstances surrounding the murders against the totality of mitigating evidence, we cannot say in the balance that the MAR court unreasonably applied Supreme Court precedent in concluding that counsel's failure to introduce such ostensibly mitigating evidence prejudiced Bowie.

B.

Next, Bowie argues cursorily that his counsel rendered constitutionally ineffective assistance by failing to object to the admission of William's statement and by failing to request a limiting instruction that the statement was to be used only against William.[11] The MAR court considered this argument insofar as Bowie's conviction was implicated, finding no prejudicial error. Bowie now argues that the MAR court erred by not analyzing this argument in the context of his sentencing.[12] The district court found that Bowie had procedurally defaulted on this claim by not properly raising it before the MAR court. We agree.

"[A] federal habeas court may consider only those issues which have been 'fairly presented' to the state courts." *Matthews v. Evatt*, 105 F.3d 907, 911 (4th Cir. 1997) (quoting *Picard v. Connor*, 404 U.S. 270, 275-78 (1971)). The burden lies with the petitioner to show that the claim was exhausted. *Id.*

Bowie did present a version of this ineffective assistance argument to the MAR court. Under the heading "First Claim (Ineffective Assistance of Counsel: Guilt Innocence Phase)" in his MAR, J.A. 342, Bowie argued without citation to any caselaw or legal principle, "Counsel erred when they did not object to the content of the sanitized statement of William Bowie in that it contained statements that could be utilized against defendant Nathan Bowie," J.A. 345. Notwithstanding the brevity of the argument, the MAR court considered the argument in detail, finding the statement properly admitted but finding counsel deficient for not requesting a limiting instruction.

---

[11]A co-defendant's statement that has been "redacted to eliminate not only the defendant's name, but any reference to his or her existence" is admissible if given with a limiting instruction confining its use to consideration of the co-defendant's case. *Marsh v. Richardson*, 481 U.S. 200, 211 (1987).

[12]We surmise that analysis of harmlessness would differ in the context of sentencing, because instead of deciding whether the jury would still have returned a conviction beyond a reasonable doubt, the court would have to decide whether the jury would still have unanimously recommended a death sentence.

Nevertheless, the MAR court found such error to be harmless beyond a reasonable doubt because the evidence of Bowie's guilt was overwhelming. Therefore, the MAR court concluded, counsel's failure to request the instruction did not prejudice Bowie. The MAR court did not consider whether the failure to issue a limiting instruction was also harmless error with respect to Bowie's sentencing.

Despite the fact that he presented the argument to the MAR court only under the "Guilt Innocence Phase" portion of his MAR, without citations or explication, Bowie now points to certain stock language in his MAR to argue that the sentencing argument was adequately presented to the MAR court. Bowie's MAR provided that "[c]ounsel incorporates by reference all *facts* alleged in the claim respecting ineffective assistance of counsel at the guilt phase. All of these factors [sic] would be applicable to the sentencing phase." J.A. 349 (emphasis added). This provision in Bowie's complaint incorporates only facts, not arguments, and presents only boilerplate language. It is therefore far from sufficient to put the MAR court on notice that, in addition to alleging that counsel's failure prejudiced him in his conviction, Bowie intended to argue also the question of whether the admission of William's statement prejudiced him at sentencing, an analysis requiring application of a different standard of harmlessness.

We therefore find that the district court properly regarded this claim as procedurally defaulted.

## C.

Finally, Bowie argues that his counsel provided ineffective assistance in failing to renew on direct appeal his trial objection, on Confrontation Clause grounds, to the admission of Rochelle's statement. Bowie presented this argument to the MAR court, which found first that the admission did not violate the Confrontation Clause, and second that an appellate court would have found any error to be harmless in light of the other evidence available at sentencing. The district court upheld the MAR court's analysis, finding that counsel's failure to appeal the admission of Rochelle's statement did not constitute deficient performance and did not prejudice Bowie in any event.

We decline to determine whether the MAR court properly applied the deficiency prong of *Strickland* because we find that it was not

unreasonable in finding that any deficiency on appeal did not prejudice Bowie with respect to his sentence. Had counsel appealed the Confrontation Clause issue, the reviewing court would have tested any error it found for harmlessness. *See United States v. Banks*, 482 F.3d 733, 741 (4th Cir. 2007). That is, the reviewing court would have analyzed whether there was a reasonable probability that, had Rochelle's statement been excluded at trial, the jury would have recommended a sentence other than death. *See Strickland*, 466 U.S. at 694.

Rochelle's statement added little to the body of evidence before the jury. Her recount of the events leading up to the murders was corroborated by other witnesses, and served mainly to provide background to the otherwise undisputed accounts. The only material portion of her statement not also available to the jury from other witnesses is the statement by Bowie or William, "we got them," J.A. 30. While this statement may have bolstered the evidence for the convictions of Bowie, it does little to speak to the aggravating and mitigating factors that determined Bowie's sentence. There was overwhelming evidence otherwise available to support the finding of the aggravating factors relating to multiplicity of the murders, and the statement does not call into question the mitigating circumstances such as, for example, that Bowie was well-liked or suffered a tumultuous upbringing.

We conclude that the MAR court did not unreasonably apply Supreme Court precedent in concluding that counsel's failure to appeal the admission of Rochelle's statement did not prejudice Bowie in his sentencing.

IV.

Because we find that the district court properly rejected each of Bowie's claims underlying his petition for habeas corpus, the judgment of the district court denying the petition is

*AFFIRMED.*