GREGORY, Circuit Judge,
dissenting:
Because “[d]eath is different[,]” Gregg v. Georgia, 428 U.S. 153, 188, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976), an attorney’s failure to present mitigating evidence in a capital case takes on heightened significance. Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). While my colleagues provide a thorough recitation of the facts, they fall short in applying the Sixth Amendment, which guarantees every defendant effective assistance of counsel. Id.
Strickland and its progeny establish that trial counsel is constitutionally obligated to provide effective assistance and to comport with prevailing professional norms. Id. Counsel must also investigate and introduce mitigating evidence unless he or she could “reasonably surmise” that evidence “would be of little help.” Id. at 699, 104 S.Ct. 2052; Wiggins v. Smith, 539 U.S. at 525, 123 S.Ct. 2527 (holding that counsel’s failure to investigate mitigation evidence was ineffective but noting that further investigation is excusable where counsel has evidence suggesting it would be fruitless). In capital cases where a defendant does not claim actual innocence and the jury only has one choice — life imprisonment or death, counsel’s sole role is to advocate effectively for a life sentence.
Here, defense counsel (“David Freedman” and “Danny Ferguson,” collectively “defense counsel”) knew that before murdering his father, Robert, and step-mother, Audrey, Frogge suffered a subdural hema-toma and a subarachnoid hemorrhage to his brain, significantly altering his personality and ability to function. Specifically, *67 Frogge had speech problems, memory problems, and exhibited personality changes. He became more fearful, anxious, paranoid, easily agitated, and explosive. In Frogge’s first trial (“Frogge I”), defense counsel secured Dr. Hoover, a neuropsychologist, to testify that the brain injury induced Frogge’s violent actions. But in Frogge’s second trial (“Frogge II”) defense counsel did not introduce the brain injury or seek neurological testing from an expert qualified to evaluate the extent to which that injury affected Frogge. The Superior Court of Forsyth County’s (“MAR Court”) held that defense counsel’s failure to conduct neurological testing and introduce Frogge’s brain injury was ineffective assistance of counsel. The North Carolina Supreme Court reversed the MAR Court and found that defense counsel’s failure to do so was a sound and strategic trial tactic. When “directly assessed for reasonableness in all the circumstances,” this holding is untenable. Wiggins, 539 U.S. at 533, 123 S.Ct. 2527 (quoting Strickland, 466 U.S. at 690-91, 104 S.Ct. 2052).
In my view, one cannot, on this record, “reasonably surmise” that the evidence of Frogge’s organic brain damage would have been of “little help.” Hence, my principal concern is not whether counsel should have presented a mitigation case, but rather whether counsel’s failure to seek neurological testing from an expert qualified to evaluate conditions known to exist was itself reasonable. Wiggins, 539 U.S. at 523, 123 S.Ct. 2527. As the majority, remarkably answers this question affirmatively, I must dissent.
I.
The Supreme Court, in Wiggins, held that it is constitutionally ineffective for counsel not to investigate and introduce mitigating evidence of a defendant’s social background. 539 U.S. at 525, 123 S.Ct. 2527. Although aware of Wiggins’s unfortunate childhood, counsel in Wiggins did not investigate his family and social history, which revealed that he was abused, and had limited intellectual capacities and a childlike emotional state. Id. at 516, 123 S.Ct. 2527. The post-conviction court concluded that the decision not to investigate was strategic and, thus, not ineffective. Id. at 519, 123 S.Ct. 2527; see also Strickland, at 690-91, 104 S.Ct. 2052 (“Strategic choices made after thorough investigations are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation”). The Supreme Court resoundingly rejected the post-conviction court’s holding, concluding that the investigation was inadequate and a reasonable competent attorney would have realized that pursing those leads was necessary to making an informed choice among possible defenses. Id. at 526, 534, 123 S.Ct. 2527.
Similarly in Rompilla v. Beard, 545 U.S. 374, 125 S.Ct. 2456, 162 L.Ed.2d 360 (2005), the Supreme Court found Rompilla’s counsel ineffective for failing to review Rompilla’s court file and to present significant mitigating evidence about Rompilla’s childhood, mental capacity, alcoholism, and prior conviction. Id. Noting that counsel unreasonably relied on family members and medical experts to tell them what records might be useful in Rompilla’s mitigation case, the Court stated: “[tjhere is no need to say more, however, for a further point is clear and dispositive: the lawyers were deficient in failing to examine the court file on Rompilla’s prior conviction.” Id. at 383, 125 S.Ct. 2456.
II.
Here, the majority upholds the State Supreme Court’s objectively unreasonable *68 application of Strickland’s principles. The State Supreme Court reversed the MAR Court on the basis that: (1) defense counsel conducted more than a sufficient investigation; and (2) it was a sound strategic defense to rely on expert opinion since the expert, Dr. Tyson, had Frogge’s medical records and Frogge I transcripts. The record does not support either holding.
To their credit, defense counsel in Frogge I did investigate and present a persuasive mitigation case. But see Wiggins, 539 U.S. at 524, 123 S.Ct. 2527 (noting that counsel abandoned their investigation of Wiggins’s background after having acquired only rudimentary knowledge of his history from a narrow set of sources.). However, for Frogge II, where the only salient issue was whether Frogge would receive a death sentence for Audrey Frogge’s murder, defense counsel clearly demonstrated a lack of attention to investigating and presenting critical mitigation evidence in a capital case.
In Frogge I, State expert, Dr. Kramer, undercut Dr. Hoover’s opinion primarily on the basis that Dr. Hoover did not conduct neurological testing in support of his opinion that Frogge’s brain injury was permanent and affected his mental capabilities. Because, in their view, Dr. Hoover testified poorly, defense counsel sought out a new expert for the second trial. Remarkably, defense counsel hired Dr. Tyson, a clinical psychologist, not specialized in neuroscience or neuropsycholo-gy, and who by his own admission could not perform the relevant neurological tests. (J.A. 1109.) Notwithstanding knowledge of Frogge’s brain injury and the need for neurological testing, defense counsel waited until the eve of Frogge’s second trial to ask Dr. Tyson, whether Frogge’s brain injury “affect[ed] his evaluations.” (J.A. 1875.) Even though at least one juror found that Dr. Hoover’s testimony in the first trial supported the statutory mitigating factor of mental illness, defense counsel accepted Dr. Tyson’s opinion that the brain injury was irrelevant. Having not provided any family statements or Frogge’s medical records to Dr. Tyson, it was unreasonable for defense counsel to rely on or, in the majority’s words, be “convinced” by Dr. Tyson’s uninformed opinion. (Maj. Op. at 63.) Moreover, given that Dr. Kramer eviscerated Dr. Hoover’s opinion based on his failure to conduct neurological testing, it is unfathomable that defense counsel would not obtain such testing to shore up this glaring weakness.
What is more, there is no evidence that defense counsel’s failure to conduct neurological testing and present Frogge’s brain injury was a “strategic” decision. Defense counsel did not testify or even suggest that they thought it a better strategy to not present the brain injury evidence. The ABA Guidelines for Appointment and Performance of Defense Counsel in Death Penalty Cases notes that mental health mitigation evidence is extremely important to capital sentencing juries. See Commentary to ABA Guideline 4.1 (stating that “mental health experts are essential to defending capital cases.”). The “[Supreme Court] [has] long [] referred [to these ABA standards] as ‘guides to determining what is reasonable.’ ” Wiggins, 539 U.S. at 524, 123 S.Ct. 2527.
In Frogge’s case, the most persuasive mitigating evidence regarding his mental health was kept from the jury. The mandate of Strickland and the Constitution is not simply to investigate, but rather to provide “effective” assistance. Defense counsel’s actions in light of the circumstances were “rudimentary” and certainly illogical and unreasonable. While I do not suggest that defense counsel must scour the earth “shopping” for the most preemi *69 nent experts, I do believe that justice requires, at a minimum, for counsel to secure an expert in the relevant field. This is particularly so, for a counsel who knows, as here, the specific testing required to support its mental health defense.
Without question, defense counsel’s initial inquiry revealed that neurological testing was necessary. The anecdotal evidence of Frogge’s post-brain injury behavior, Dr. Hoover’s assessment, and the testimony of Dr. Kramer taken together illustrate that defense counsel could not have “reasonably surmised” that neurological testing, in spite of Dr. Tyson’s opinion, would have been fruitless. Indeed, it is neurological testing alone that revealed that Frogge suffers from permanent organic brain damage. Thus, defense counsel’s decision not to conduct neurological testing or even present evidence of Frogge’s brain injury was unreasonable in light of Strickland and prevailing professional norms.
III.
Additionally, the record further underscores the State Supreme Court’s unreasonable denial of relief. The State Supreme Court held that it was objectively reasonable for defense counsel to rely on Dr. Tyson’s assessment because Dr. Tyson had Frogge’s medical and social histories, and transcripts from Frogge I. (J.A. 2198.) How the State Supreme Court reaches this conclusion is befuddling. The MAR court specifically found that:
Dr. Tyson did not perform or request any neurological or neuropsychological tests on [Frogge], and none were done. His diagnosis was not supported by reliance on any such tests, review of medical records concerning the 1990 head injury or descriptions by family and friends of changes in the defendant’s behavior after that injury.
(J.A. 2135, emphasis added.) In light of the Anti-Terrorism Effective Death Penalty Act’s mandate that a state court’s findings of fact are entitled to a “presumption of correctness,” the State Supreme Court’s factual error is a dispositive display of an “erroneous application of facts to the law.” 28 U.S.C. § 2254(e)(1). First, Ferguson testified that he did not “recall” or “think” that he provided the medical records or social history reports to Dr. Tyson. (J.A. 1909). Second, in an affidavit provided to the MAR court, Dr. Tyson attested that he was not provided with, nor did he review, any medical records concerning Frogge’s brain injury. (J.A. 1109.) Third, Freedman also submitted an affidavit attesting that he did not provide Dr. Tyson with Frogge’s medical records, which detailed Frogge’s brain injury. (J.A. 2028). Finally, the State Supreme Court did not find any error in the MAR court’s clear factual findings.
According to the majority, the State Supreme Court’s factual error is inconsequential because the court “merely observed” that Dr. Tyson reviewed the medical records. However, the majority, itself, recognizes that the State Supreme Court thrice stated this factual error.[1] *70 Most tellingly, it was only in the context of this erroneous factual predicate — Dr. Tyson being given Frogge’s medical and social histories — that the Court decided whether defense counsel’s failure to pursue neurological testing was objectively reasonable and prejudicial to Frogge. (J.A. 2198.) The State Supreme Court’s rationale demonstrates that the Court’s holding was tethered to a significant factual error. The majority’s observations to the contrary are incredulous.
Put simply, the State Supreme Court’s assumption that Dr. Tyson offered an opinion informed by Frogge’s medical records was clearly erroneous and reflects “an unreasonable determination of the facts in the light of the evidence presented in the State court proceeding.” § 2254(d)(2). Moreover, the State Supreme Court’s conclusion that the scope of defense counsel’s investigation of Frogge’s mental health meets the legal standards of Strickland is an objectively unreasonable application of Supreme Court precedent.
IV.
Unlike the majority, I am also certain that defense counsel’s “ineffective assistance” prejudiced Frogge within the meaning of Strickland. Under Strickland, Frogge must show that “but for counsel’s unprofessional errors, the [sentence] would have been different.” Bowie v. Branker, 512 F.3d 112, 120 (4th Cir.2008). In determining prejudice, we must “reweigh the evidence in aggravation against the totality of available mitigating evidence.” Wiggins, 123 S.Ct. at 2542.
Because the State Supreme Court reversed the MAR Court on the Strickland performance prong, it did not assess Frogge’s ineffective assistance claim for prejudice. The State, however, offered substantial evidence of aggravating circumstances. For example, the State emphasized that Audrey was bedridden and Frogge stabbed her over eleven times. Due to her condition, she was also forced to watch Frogge stab his father to death. Frogge also testified that Audrey had done nothing to provoke his rage.
Mental health evidence was the crux of Frogge’s mitigation case. How else to explain why the same young man who thoughtfully came home to make his bedridden step-mother a grilled cheese sandwich and tomato soup would, mere hours later, beat her to death. Thus, it was paramount for defense counsel to offer an explanation as to why Frogge went into an uncontrollable rage and murdered Audrey. Dr. Tyson testified that Frogge likely suffered from personality disorder and had limited functioning skills aggravated by substance abuse. Unlike Frogge I, no evidence of Frogge’s brain injury — let alone organic brain damage — was presented to the jury, despite defense counsel’s belief that the injury was significant. “Under North Carolina law, ... the prejudice inquiry in this case distills to whether [Frogge] had shown that there is a reasonable probability that, but for counsel’s deficient performance, at least one jury member would have found the mitigating circumstances outweigh the aggravating circumstances and recommended life imprisonment.” Bowie v. Branker, 512 F.3d at 120.[2]
The answer to this inquiry is obvious. When presented with evidence of Frogge’s *71 brain injury at least one juror in Frogge I found that the crime was committed under the influence of mental or emotional disturbance, thereby depriving Frogge of the capacity to appreciate the criminality of his conduct — a statutory mitigating factor under North Carolina law. The absence of such evidence from the guilt and penalty phase of Frogge’s second trial undoubtedly prejudiced him. But for defense counsel’s deficient performance, the jury would have known that Frogge suffers from permanent organic brain damage — a diagnosis the State does not rebut — which “under periods of extreme emotional distress would lead him to act impulsively and not appreciate the full consequences of his actions, impairing his judgment, reasoning and impulse control.” (J.A. 1706-07.)
Given the powerful nature of this evidence, the outcome reached by the majority truly is alarming. Frogge’s organic brain damage coupled with the other mitigation evidences “might well have influenced” at least one juror’s “ ‘appraisal’ of his ‘culpability,’ ” as it did the experienced MAR judge — a rarity. Rompilla, 545 U.S. at 393, 125 S.Ct. 2456 (citing Wiggins, 539 U.S. at 538, 123 S.Ct. 2527). Quite clearly, defense counsel’s failure to even present evidence of Frogge’s brain injury and obtain neurological testing is ineffective assistance of counsel under Strickland.

. The State Supreme Court stated the following: "[Djefense counsel provided Dr. Tyson with their entire discovery file ... and made available to him defendant’s medical records;" "The material supplied to Dr. Tyson also included the testimony given at [the 1995 trial] by Drs. Hoover and Kramer, and attorney Freedman believed that Dr. Tyson testified in [the 1998 trial] that he had reviewed this testimony;” “By the time defense counsel were preparing for defendant’s second trial, they had consulted two mental health experts, Drs. Hoover and Tyson, both of whom had full access to defendant, his family, and the pertinent medical records of defendant’s head injury, and neither of whom recommended neurological testing." State v. Frogge, 607 S.E.2d at 632, 635.

. Because the State Supreme Court did not reach Strickland’s prejudice prong, we review the question of prejudice de novo. See Dugas v. Coplan, 428 F.3d 317, 327 (1st Cir.2005) (citing Ellsworth v. Warden, 333 F.3d 1, 3-4 (1st Cir.2003) (en banc) (“Appellate review of the district court's denial of habeas relief is de novo, but we accord deference to the state court as to issues it actually decided.")).